488 A.2d 995

**Gary THOMPSON**

v.

**STATE of Maryland.**

**No. 719, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

March 11, 1985.

194

Philip Utter (Nancy Cook, Assigned Public Defender, Washington, D.C., on the brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore, (Stephen H. Sachs, Atty. Gen., Kurt T. Schmoke, State's Atty. for Baltimore City and Jamie Hochberg, Asst. State's Atty., for Baltimore City, Baltimore, on the brief), for appellee.

Argued before MOYLAN, WEANT, and ROSALYN B. BELL, JJ.

MOYLAN, Judge.

The appellant, Gary Thompson, was convicted in the Circuit Court for Baltimore City by Judge Robert M. Bell, sitting without a jury, of 1) possession of cocaine with intent to distribute; 2) possession of methadone; 3) possession of narcotics paraphernalia (hypodermic syringes); 4) possession of paraphernalia (packaging material); and 5) possession of marijuana. Upon this appeal, he raises two contentions:

1) That the evidence was not legally sufficient to support the convictions; and
2) That evidence seized from his briefcase should have been suppressed.

### Sufficiency of the Evidence

All of the incriminating evidence was found in the course of a seach, pursuant to a search and seizure warrant, executed on Room 270 of the Town House Motel, 5810 Reisterstown Road, on February 26, 1981. The room was registered to one Harriet Oliver, a close friend of the appellant. The appellant was not present at the time of the search. The appellant was found to be in joint possession of the contraband. The attributes of joint possession were well spelled out by us in *Folk v. State*, 11 Md.App. 508, 511–512, 275 A.2d 184 (1971):

> "It is well-settled that the proscribed possession of marihuana or of narcotic drugs under the Maryland law need not be sole possession. '[T]here may be joint possession and joint control in several persons. And the duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title.' ...

> Nor is it necessary, in order to be found in joint possession of a contraband drug, that the appellant have a 'full partnership' in the contraband." (Citation omitted).

■ We have no difficulty in holding that the evidence was legally sufficient to permit the fact finder to draw the inference that the appellant was exercising constructive dominion and control over the contraband that was seized. The appellant was no stranger to the motel room in question. The police had actually been in the motel room for another purpose, not here pertinent, shortly before the execution of the search and seizure warrant. At the time of that earlier entry, Harriet Oliver and the appellant were standing in close proximity to a dresser, but moving away

from it, as the police entered. There was cocaine, in the obvious course of being made ready for distribution, in open view on that dresser. There were two bottles of manite, a substance used as a cutting agent for cocaine, on the same dresser. Four hypodermic needles, some syringes, and three bottle caps with cotton were also found on the dresser. There were twelve white envelopes for packaging and a stocking for straining cocaine, also on the dresser. In addition to evidence of manufacturing and distributing, there was evidence of personal use of the cocaine as well. There was a mirror, a razor blade, and straws for snorting cocaine. The straws contained cocaine residue. Both methadone and marijuana were observed in the general area.

The police, who were there initially only for the purpose of executing an arrest warrant for Harriet Oliver, did not seize any of this evidence at the time of their initial observation of it.

They arrested Harriet Oliver, a second female by the name of Ms. Buice, and the appellant, transporting them immediately to the Northern District. The scene in which the appellant was observed was then frozen until the police returned not long thereafter, with a full search and seizure warrant based upon those earlier observations. The further search revealed papers indicative of financial transactions, a gun, and a briefcase taken from beneath the bed. The briefcase contained a picture of the appellant and a piece of paper bearing his name. The room itself, moreover, contained both men's and women's clothing. In addition to the three human occupants at the time of the first entry, the room was also occupied by three dogs. When the officers mentioned taking the dogs to an animal shelter, the appellant spoke up and stated that he would have someone pick them up. The appellant's wife eventually claimed the dogs from the animal shelter.

A motel employee indicated that she had called Room 270 earlier in that day to pass on complaints about the barking dogs. That employee indicated that sometimes a woman

answered the phone in the motel room but sometimes a man did. That employee further described a thin black man in his middle 30's or early 40's, matching generally the description of the appellant, as the man who had paid the rent on the room during the month of February.

In *Folk v. State, supra,* we analyzed the many cases affirming findings of joint possession and summarized the common denominator characteristics, at 11 Md.App. 518, 275 A.2d 184:

"The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband."

We hold that the evidence was legally sufficient to permit Judge Bell to infer that the appellant had an adequate nexus with the contraband to sustain the verdicts in this case.

### Standing as to the Briefcase

We turn to the suppression issue. Clearly, the papers and photograph found in the briefcase under the bed, linking the appellant with the room, were evidentiary items of real significance. The appellant asserts that he had Fourth Amendment standing in this briefcase, that was both seized and searched. Indeed, the appellant's argument, at the suppression hearing, focused narrowly on this standing in the briefcase, in contrast to a virtual concession of non-standing in the larger motel room itself:

"I have no argument as to presence, whether or not the defendant has standing to contest the search and seizure warrant, the items that were found in the motel room. I

would like to advise the court in addition to the other evidence found in the motel room, there was a briefcase, a closed briefcase, found in the motel room, which was subsequently seized pursuant to the warrant and subsequently opened and in there was found marijuana and a slip or piece of paper with the name of the defendant. My suppression motion goes to everything as an advocate for my client, but specifically my suppression motion also goes to the validity of the seizure of the briefcase because ... there is no question that my client does at least have standing as to the briefcase."

We agree with the appellant as to his standing to challenge the search of the briefcase. When the officers were initially searching the motel room, they were searching both the room at large and all containers within it for "controlled and dangerous substances and the items used in their manufacture, distribution and use." Without suggesting that it would have made any difference, we note that the officers had no reason to believe that the briefcase under the bed was the special property of the appellant, as distinguished from any other closet, drawer, box, suitcase, or purse examined in the course of the larger search. The reasonableness of the police behavior has nothing, however, to do with standing to object. The reasonableness of police conduct, assessed from their subjective point of view in light of the facts available to them at the time of the search, bears only upon the merits of Fourth Amendment satisfaction. Standing to object, on the other hand, is assessed objectively in terms of the actual, historic facts that are developed at the time of the suppression hearing itself.

At the suppression hearing, it was developed that the appellant's photograph and identification papers were in the briefcase. We conclude that this was enough to entitle him to standing to litigate the constitutional propriety of the search of that briefcase. Standing to object, however, by no means suggests that the appellant will win upon the

Fourth Amendment merits; it simply entitles him to litigate the Fourth Amendment merits.

### Standing as to the Motel Room

■ Standing as to the briefcase does not necessarily imply standing as to the motel room itself. The Fourth Amendment interest there must be independently established. The ultimate demonstration (at the suppression hearing) of a proprietary interest in the briefcase does not necessarily imply an ultimate demonstration (at the suppression hearing) of a proprietary interest in the motel room. The appellant here failed utterly, following the State's timely challenge, to establish any standing in the motel room itself. All that came out at the suppression hearing was that the room was registered to Harriet Oliver. The appellant clearly, on the facts made available to Judge Bell before he was called upon to rule, had demonstrated no proprietary interest in the motel room itself. Nor did the appellant have any derivative standing in the place searched by virtue of being legitimately on the premises, as a guest, licensee, or invitee, at the time of the critical search in issue. *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

■ To be sure, some of the evidence ultimately brought out at the trial could have given the appellant a more plausible claim to standing with respect to the motel room, but that evidence was not offered at the time Judge Bell was called upon to rule on the issue of standing. The appellant's clothing in the motel room could have been a factor; the appellant's dogs in the motel room could have been a factor; the appellant's answering of the telephone in the motel room could have been a factor; the appellant's possible paying of the rent for the motel room for the month of February could have been a very significant factor. All of these things, in aggregate, might have contributed to a finding of a proprietary interest on his part in the place searched. They are totally beyond the pale of this assessment, however, because they were not developed

at the suppression hearing. Our limited appellate responsibility is not to decide, in an historic sense, whether the appellant had a proprietary interest in that motel room sufficient to establish standing to object. Our sole mission is to decide whether Judge Bell committed error, on the basis of the evidence before him, when he ruled that the appellant lacked such standing.[1]

On the threshold issue of standing, the allocation of the burden of proof is clear. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424, n. 1, 58 L.Ed.2d 387, 393, n. 1 (1978), stated unequivocally:

"We reject petitioners' suggestion. The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."

R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* (1983), spoke to the same allocation of the burden of proof, at 291–292:

"Procedurally, it is clear that there is an initial burden on the prosecution to raise the challenge to standing. If the State fails to raise a timely challenge and the court goes on to reach the Fourth Amendment merits, the State will be estopped from raising the challenge at a later stage. If the prosecution does raise the challenge, however, by even the most informal of oral pleadings, it is then clear that the burden of proof is allocated to the

---

**1.** Indeed, the appellant should count himself fortunate that in terms of appellate review and absent a motion to reconsider an earlier ruling, the evidentiary clock stops at the very moment the ruling occurs which we are called upon to assess. At the suppression hearing, the appellant, not through his testimony but through the representations of counsel, established standing to object to the search of the briefcase "by a whisker." If we were to look at that issue, however, with the hindsight of later trial developments, that standing would evaporate into thin air, for the appellant himself testified under oath that he had utterly no proprietary interest in, and was not even aware of the existence of, the briefcase in question. Standing "should be made of sterner stuff."

defendant to show his standing. The State has no obligation to show nonstanding."

■ The appellant had no standing to object to the search of the motel room as such. What impact has this on the merits of the search of the briefcase, which he is entitled to litigate? Since the police entry into the motel room and the police presence in the motel room are beyond the appellant's challenge, he can mount no constitutional claim that depends upon establishing the invalidity of that entry or presence. If, by virtue of that unchallengeable presence in the motel room, the police had inadvertently observed probable evidence in plain view, that evidence would be just as subject to legitimate seizure under the Plain View Doctrine as if the police presence in the room had been affirmatively shown to have been valid.

Foreclosing the appellant from litigating the legitimacy of the police entry into or presence in the motel room, however, is not dispositive of his claim on the merits. The briefcase itself was searched by virtue of the search and seizure warrant, just as was the motel room at large. If the unchallengeable presence of the police in the room had itself established sufficient cause to open the briefcase, the appellant would lose on the Fourth Amendment merits. Such, however, was not the situation here. There was nothing suspicious about the briefcase itself, even conceding the right of the police to be in a position to view it. It was opened, rather, in the course of the execution of the warrant itself. The entitlement of the appellant to litigate the opening of his briefcase thereby entitles him to litigate the propriety of the warrant which authorized the opening of his briefcase.

■ The possible repercussions from the appellant's entitlement to litigate the propriety of the search warrant, however, are still limited to the appellant's demonstrated Fourth Amendment interests. A bad warrant, for instance, could call for the suppression of the fruits of the search of the briefcase, in which the appellant established his Fourth

Amendment interest. The same bad warrant, on the other hand, would have no adverse impact whatsoever on the fruits of the search of the room at large, in which the appellant failed to establish any Fourth Amendment interest. With respect to a place in which the appellant had no Fourth Amendment interest, he could not be heard to complain even if the police had searched it without any warrant at all, let alone with a warrant that was merely arguably defective.

### The Merits of the Search Warrant
#### Probable Cause

Ironically, the Fourth Amendment litigation before Judge Bell and the Fourth Amendment litigation before us bear very little resemblance to each other. Since our primary appellate obligation is to determine whether the trial judge was in error when he declined to suppress the physical evidence, our concern will be with the issues raised before Judge Bell and not with other issues raised here for the first time.

We have combed every line of argument from the July 25, 1983, suppression hearing and find that, aside from the issue of the appellant's standing in the briefcase, the hearing was concerned only with whether the factual allegations spelled out in the application for the search and seizure warrant established probable cause, as a matter of fact, to believe that there were "controlled and dangerous substances" and related paraphernalia in the motel room to be searched. That was the exclusive issue raised and the exclusive argument made by Leslie Stein, attorney for the appellant. There was a very narrow focus to the issue before Judge Bell for determination:

"It is our position that the warrant fails to establish probable cause for that warrant for them to go back in that motel room for the reason that all the evidence and all the narcotics sat in plain view was seized. I know of no case that holds mere appearance or finding of drugs at

a certain location gives rise to an inference that more drugs are at that location."

The conclusion of counsel's argument summed up the issue for determination:

"[T]he issue is whether or not that warrant expressed probable cause, and our position is that it does not. All you have is that the narcotics were found."

We have examined, as did Judge Bell, the affidavit of Officer Paul Miller, offered in support of the warrant application. After reciting his training and experience, which was extensive, in the field of narcotics investigation and after reciting his entry into the motel room, with four other officers, to serve an arrest warrant on Harriet Oliver, Officer Miller got to the core of the probable cause:

"During the time I was in the room, I observed a marihuana pipe containing a greenish vegetable substance which I believed to be marihuana on the night stand by the bed in open view and on the dresser in open view was a container of white crystal powder, which I believed to be cocaine and several white paper envelopes, a wire screen, and a spoon, money, and a pad of white paper that the envelopes were made of.

I, Officer Paul Miller, based on the above information and the training and by past experience know that these items are used for the manufacture, distribution, and use of controlled, dangerous substances marihuana, cocaine, and other abused drugs. Based on the above information, your affiant believes by past experience that the room contains more controlled and dangerous substances and the items used in their manufacture, distribution, and use."

When defense counsel concluded, "All you have is that narcotics were found," Judge Bell corrected him by pointing out that the affidavit referred to other items as well, indicating the manufacture and distribution of narcotics:

"You also have, as I read it, these observations and a container of white powder and several white paper en-

velopes, a wire screen and a spoon, money, and a pad of white paper that the envelopes were made of. Officer Miller says, based on the above information and training and by past experience, he knows that these items are used for the manufacturing and distribution and use of controlled dangerous substances and other use of drugs. He believes that his past experience knows that these items are used in the distribution and use of controlled dangerous substances."

On the only issue presented to him for determination on the merits of the search warrant, Judge Bell reached a firm conclusion:

"[I]f he does have standing to contest the warrant, then I would find there is probable cause."

The spirit with which we must approach a review of a probable cause finding by a warrant-issuing judge was made very clear by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983):

"Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' *Spinelli* [*v. United States* ], *supra,* [393 U.S. 410] at 419 [89 S.Ct. 584 at 590, 21 L.Ed.2d 637 (1969) ]. 'A grudging or negative attitude by reviewing courts toward warrants,' *Ventresca, supra,* 380 U.S., [102] at 108 [85 S.Ct. 741 at 745, 13 L.Ed.2d 684 (1965) ] is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; 'courts should not invalidate ... warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.' " 462 U.S. at 236, 103 S.Ct. at 2331.

■ *Illinois v. Gates,* moreover, was very precise as to the test to be applied:

"Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's

probable-cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.*

■ We hold that Judge Bell had a "substantial basis for concluding" that a search of the motel room "would uncover evidence of wrongdoing." "The Fourth Amendment requires no more."

### The Merits of the Search Warrant
#### Duplicate Copy vs. Original

We have grave reservations whether, under Maryland Rule 1085, this next issue is properly preserved for appellate review. At the suppression hearing, Judge Bell ruled unequivocally that the appellant had no standing in the briefcase and, in the alternative, that even if the appellant had standing, there was probable cause to issue the warrant to search the entire room, including the briefcase. As the suppression hearing was adjourning, however, the final words there spoken alluded to an issue that had never theretofore been mentioned:

"The Court: Ms. Hochberg, I am going to give your warrant back to you now and trust that tomorrow I will have the original.

Ms. Hochberg: Yes, your Honor."

As the trial was about to commence on the following day, the assistant state's attorney brought up the subject of the missing original:

"[Ms. Hochberg:] Before we proceed with the merits of the case, yesterday we argued a motion for the suppression of the warrant. The warrant has not been introduced in evidence, at that time it could not be located. I requested the Clerk of the Court, Mr. Timothy Werner, and after a diligent search, he did not find it. Detective Paul Miller requested Mr. Werner to search again, and Mr. Werner advises me that it was never returned to the Clerk's Office. Therefore, I do not have the original. The Court: Who had it?

Ms. Hochberg: It was signed out by Judge William Murphy originally. I do have another, I believe it is a copy, however, I think we have the original signature of Judge Murphy on here, which I move to introduce in place of the original. I think this one is a copy that the judge signed at that time. I believe since we have two copies of the warrant, one is the original and one is a photostatic copy, and I do have this copy, which I am showing Mr. Stein. Detective Miller is in court and available to testify that Judge Murphy signed the warrant in court. I will provide the Court with a photostatic copy.

The Court: This is the original signature?

Ms. Hochberg: Yes, your Honor."

Because the court then treated this subject of the missing original, for some ten pages of the transcript, we will consider this treatment as a limited reopening of the suppression hearing for the purpose of deciding whether a copy of the warrant would be received in evidence in place of the lost original.

### A. The "Best Evidence" Rule Inapplicable

The appellant is clearly trying to take advantage of what he hopes is a technical violation of the so-called "Best Evidence" Rule, which, as every treatise writer on evidence points out, should more properly be called the "Original Document" Rule. A brief discussion of the rule's purpose will place the present contention in its proper context. *McCormick on Evidence* (2d ed. 1972), § 230, "Original Document Rule," at 560, states the rule concisely:

"The specific context in which it is generally agreed that the best evidence principle is applicable today should be definitely stated and its limits clearly defined. The rule is this: in proving the terms of a writing, where the terms are material, the original writing must be produced unless it is shown to be unavailable for some reason other than the serious fault of the proponent."

The "Original Document" Rule is an evidentiary rule of preference and, when the contents of the document

are in dispute, rests for its justification on the chance of human error in the copying process. The purpose designed to be served by the rule was again well summarized by *McCormick*, § 231, "The Reasons for the Rule," at 561:

"[P]resenting to a court the exact words of a writing is of more than average importance, particularly in the case of operative or dispositive instruments such as deeds, wills or contracts, where a slight variation of words may mean a great difference in rights. In addition, it is to be considered (1) that there is substantial hazard of inaccuracy in many commonly utilized methods of making copies of writings, and (2) oral testimony purporting to give from memory the terms of a writing is probably subject to a greater risk of error than oral testimony concerning other situations generally. The danger of mistransmitting critical facts which accompanies the use of written copies or recollection, but which is largely avoided when an original writing is presented to prove its terms, justifies preference for original documents."

 The appellant would like to take advantage of the fact that only a copy instead of the original document was offered to the court, but he fails utterly to relate his objections to any possible undergirding purpose that this evidentiary rule of preference was designed to serve. There was in this case no issue raised as to the contents of the search warrant itself. It is a mass-produced, printed form put out by the Operations Bureau of the Baltimore City Police Department and referred to as "Form 77/187." Fully 85% of its contents is printed up in advance with only a few blanks left to be filled in, such as the date of issuance and the name of the officer applying for the warrant. One critical blank permits a brief descriptive reference of the place to be searched. Another critical blank permits reference to the likely evidence that is the subject of the search and seizure. In the present case, no remote question was raised by the appellant that the place to be searched ("5810 Reisterstown Rd., room 270, Town House Motel, 2nd fl.") was not adequately described. By the same token, no

remote question was raised by him that the reference to "cocaine, marihuana, paraphernalia for packaging and distribution of controlled dangerous substances" did not describe with adequate particularity "the things to be seized." The contents of the search warrant were simply not in dispute and the entire *contretemps* about the "Original Document" Rule is, therefore, immaterial. A rule does not exist for its own sake, but only to serve a purpose.

 Where, as here, the terms of the warrant are not in dispute,[2] the words of *McCormick*, § 233, "What Constitutes Proving the Terms," at 563, are particularly apropos:

"It is apparent that this danger of mistransmission of the contents of the writing, which is the principal reason for the rule, is only important when evidence other than the writing itself is offered for the purpose of proving its terms. Consequently, evidence that a certain document is in existence or as to its execution or delivery is not within the rule and may be given without producing the document."

### B. *The "Best Evidence" Rule Satisfied*

 Even if the "Original Document" Rule had any bearing on an issue before the court, it appears clearly to

---

**2.** If the issue sought to be raised by the appellant is not one concerning the contents or terms of the "writing" (the warrant) but rather one of whether it was properly issued (whether Judge Murphy actually signed it), that is a totally different type of evidentiary problem. That is an authentication problem and not a "Best Evidence" Rule problem. *See* 4 J. Wigmore, *Evidence* (Chadbourn rev. 1972), § 1187, "Dispensing with authentication does not dispense with production"; § 1188, "Dispensing with production does not dispense with authentication"; 7 J. Wigmore, *Evidence* (Chadbourn rev. 1978), § 2134, "Authentication as involving either signature or contents"; § 2145a, "Contents of document not necessarily admissible." The authentication of a search warrant, that is, the proof of its valid issuance, may be proved by evidence other than the production of the document itself, such as the proffered testimony of the police officer in this case that he saw Judge Murphy sign the warrant. This type of problem has nothing to do with the "Best Evidence" Rule or "Original Document" Rule, which is concerned only with the content or terms of the writing, not with the validity of its issuance.

have been satisfied. The copy of the warrant submitted to the court apparently was a "duplicate original." What emerges from the transcript is that Judge William Murphy signed several copies of the warrant and that the one submitted to Judge Bell bore the original signature of Judge Murphy. With respect to Judge Murphy's signature on the actual warrant itself, Judge Bell concluded, "I am satisfied that this is the original signature on the first page." Courts and Judicial Proceedings Article, § 10–103, "Admissibility of duplicate in evidence," in subsection (a)(3)(i) defines "original" as "the writing itself or any counterpart intended to have the same effect by a person executing or issuing it."

The warrant offered to the court in this case passed muster by two alternative routes. Even if it were not deemed a counterpart "original," as discussed above, it would still qualify as a "duplicate." Section 10–103(a)(4) defines "duplicate" as:

"[A] counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic rerecording, or by chemical reproduction, or by other equivalent techniques which accurately ... reproduce the original."

That same § 10–103 then goes on, in subsection (b) to set forth the admissibility of such a duplicate:

"A duplicate is admissible in evidence to the same extent as an original unless:

(1) A genuine question is raised as to the authenticity of the original; or

(2) Under the circumstances, it would be unfair to admit the duplicate in lieu of the original." [3]

Under the circumstances of this case, there was no "genuine question ... raised as to the authenticity of the origi-

---

**3.** See the virtually verbatim provisions of Rule 1003 of the Federal Rules of Evidence and the "Editorial Explanatory Comment" to that Rule.

nal" and no remote indication that it would be "unfair to admit the duplicate in lieu of the original."

A vast chasm of time and technological advance separates the world of manual copying, in which the rule was born, from the world of highly sophisticated, mechanical reproduction today. *McCormick*, § 236, "Mechanical Reproductions," at 567, described that earlier world, out of which the rule of preference grew:

> "The treatment of copies under the rule requiring the production of the original document can only properly be understood when viewed in light of the technological history of copying itself. In its earliest stages, the rule appears to have developed against a background of copying performed by individuals of the Bob Cratchit sort, transcribing manually not always under the best of conditions. Errors under such circumstances were routinely to be expected."

Professor Irving Younger vividly describes the human frailty of a copier, as a Bob Cratchit, fingers numbed by the cold in the counting house and fraught with anxiety over the health of Tiny Tim, might distractedly misplace a decimal point, invert a pair of digits or drop a line. A Xerox machine, by way of contrast, does not worry about Tiny Tim and does not, therefore, misplace decimal points, invert digits, drop lines, or suffer any of the other mental lapses that flesh is heir to.

C. *The "Best Evidence" Rule Excused*

 Even if the "Original Document" Rule were applicable and were unsatisfied, secondary evidence would have been acceptable under the circumstances of this case. All that is required, by a rule that is simply a rule of preference, is that the best *obtainable* evidence be produced. As Professor Younger captures the essence of the rule, it simply commands, "You always have to produce the original document ... unless you can't."

 The State made an adequate showing that the original copy of the warrant was lost. It was checked out

to Judge William Murphy, to whom the warrant had to be returned five days after its execution. Diligent searches had been made not once, but twice with the clerk's office and had come up empty-handed. The loss was not through any fault of the State. Under the circumstances, secondary evidence is always to be preferred over no evidence at all. *Nutt v. State,* 16 Md.App. 695, 700, 299 A.2d 468 (1973); *Campofreda v. State,* 15 Md.App. 693, 701, 292 A.2d 703 (1972); *Anderson v. State,* 9 Md.App. 532, 539, 267 A.2d 296 (1970).

### The Merits of the Search Warrant

### *"Fruit of the Poisonous Tree Doctrine"*

The appellant's final contention, made on appeal but not at the suppression hearing or trial, is that the search and seizure warrant for the motel room was itself the tainted fruit of the earlier unconstitutional entry of that same motel room to execute the arrest warrant for Harriet Oliver. He claims that Judge Bell, *sua sponte,* should have undertaken to examine the adequacy of the arrest warrant as a necessary antecedent to assessing probable cause developed in the course of the entry to execute the arrest warrant. He claims further that the failure of the State to supply the arrest warrant, presumably either to the judge who issued the search warrant or to Judge Bell at the suppression hearing, fatally flawed the State's effort to establish probable cause.

### A. *Standing of the Appellant to Challenge the Earlier Entry*

Ordinarily, the appellant would have no standing to challenge the validity of an arrest warrant issued for anyone other than himself. In the context of this contention, however, the validity of the arrest warrant is material not to justify the seizure of Harriet Oliver as such but rather to justify the intrusion into the protected premises, under *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63

L.Ed.2d 639 (1980), for purposes of arresting Harriet Oliver. It is the entry into the room that matters, not the seizure of Harriet Oliver.

 The appellant, to be sure, established no more of a proprietary interest in the motel room at the time of the first entry than he established as of the time of the second entry. In terms of traditional proprietary interest in the place searched, the appellant was equally bereft of standing to object on both occasions. By sheer chance, however, his legitimate presence on the premises, by way of being a guest, licensee, or invitee, coincidentally gave him, under *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), a derivative standing in that motel room on the occasion of the antecedent entry [4] that he did not enjoy on the later occasion of the ultimate entry.

B. *Nonpreservation of Challenge to the Merits of the Earlier Entry*

 With respect to this contention, what the appellant clearly seeks, and claims to have earlier sought, is a "taint hearing" under the "fruit of the poisonous tree" doctrine. At neither suppression hearing nor trial, however, did he

---

4. It has now been made clear by *United States v. Karo*, 468 U.S. ——, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), that when a defendant seeks to establish that a search in question is the Fourth Amendment "fruit" of an earlier Fourth Amendment "poisonous tree," it is necessary that the defendant have the required Fourth Amendment standing to object with respect to both places and with respect to both occasions. In that case, one defendant (James Karo) lost his entitlement to litigate the Fourth Amendment merits because, although he had standing in the house that was subjected to an earlier unconstitutional monitoring of a "beeper," he lacked standing in another house ultimately searched pursuant to the probable cause developed by that unconstitutional monitoring. Conversely, two other defendants, Michael Steele and Evan Roth, had their entitlement to litigate the Fourth Amendment merits significantly restricted because, although they had standing in the house ultimately searched, they lacked standing in many of the places subjected to earlier unconstitutional "beeper" monitorings. To litigate fully under the "fruit of the poisonous tree doctrine," a given defendant must enjoy standing, independently, both as to the fruit and also as to the antecedent tree.

ever ask Judge Bell for a "taint hearing" directly or even allude to the possibility indirectly. There is, therefore, absolutely nothing in this regard properly preserved for appellate review. Md.Rule 1085.

The appellant attempts to wriggle out from under the foreclosing effect of Rule 1085 by suggesting that the suppression motion itself imposed an obligation on Judge Bell to raise *sua sponte* and to resolve *sua sponte* any conceivable issues of taint that might arguably be suggested by the probable cause recitation. Such is not the law. The distinct and separate nature of a "taint hearing," in contrast to an ordinary suppression hearing, has been made very clear by the Supreme Court. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *cf. United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

The solace the appellant seeks in *Frankis v. State*, 11 Md.App. 534, 275 A.2d 532 (1971), and *Brooks v. State*, 13 Md.App. 151, 282 A.2d 516 (1971), is not to be found there. *Frankis* did not involve a two-step, "fruit of the poisonous tree" situation at all. There was a single search on a single occasion of a single private residence. In the course of executing a search and seizure warrant for evidence of theft from interstate commerce, an FBI agent observed in plain view a gas stove, that led to the appellant's conviction for storehouse breaking. The defendant there had filed a timely pretrial motion to suppress the visual observation, challenging the validity of the search that led to that observation. Both in terms of a one-step process instead of a two-step process and in terms of litigating only an issue squarely raised by the defendant, the case bears no procedural resemblance to the one at bar.

In *Brooks v. State, supra*, the holding of the Court was that the three appellants there totally lacked standing to object to the search. Even in discussing by way of dicta, however, the two-step nature of their claim, it was made very clear that their argument that an antecedent search

warrant, preceding by several days the ultimate search in question, should have been analyzed by the suppression hearing judge, was a claim that was timely and squarely raised in front of that suppression hearing judge. Neither *Frankis* nor *Brooks* obliquely suggests any *sua sponte* obligation to go looking for "taint hearings" that are not requested.

A moment's reflection on the possible repercussions reveals the absurdity of such a notion, for the *sua sponte* obligation on the suppression hearing judge (Why not, perhaps, on the warrant-issuing judge as well?) to seek out issues would not be confined to the Fourth Amendment alone. If there were an allegation in a warrant that a suspect had a prior criminal record, would the judge *sua sponte* be required to probe whether those earlier convictions had been with the "aid and assistance of counsel" under *Burgett v. Texas,* 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967)? If there were an allegation in a warrant that a robbery victim had selected a photograph of the suspect, for whose home a warrant was then being sought, would the judge *sua sponte* be required to probe "impermissive suggestiveness" under *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)? If there were an allegation in a warrant that a codefendant had given a confession implicating the defendant and his home, would the judge *sua sponte* be required to probe for a satisfaction of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)? The problems could be infinite and the mischief, overwhelming.

■■■ The Maryland law is well settled that a defendant is not entitled to a "taint hearing" under the "fruit of the poisonous tree" doctrine unless the defendant affirmatively requests one. *Everhart v. State,* 274 Md. 459, 482, 337 A.2d 100 (1975), lucidly stated the procedural rule in this state:

"Once a defendant, with requisite standing, has timely and factually asserted that the challenged evidence was

derived from information obtained in an unlawful search and seizure, the court must afford him an opportunity to explore in detail the circumstances under which the evidence was acquired...."

Indeed, in negating the very contention made by the appellant here, the Court of Appeals there stated clearly:

"[W]e agree with the conclusion reached by the Court of Special Appeals ... that the 'warrant-issuing magistrate is not required to raise, *sua sponte,* possible constitutional problems' which might appear from the face of the application...."

*See also Carter v. State,* 274 Md. 411, 337 A.2d 415 (1975).

■ Absolutely dispositive of the appellant's claim that there is some *sua sponte* obligation on a judge who issues a second warrant also to determine the validity of an antecedent warrant, where the entry under the earlier warrant led to the probable cause for the issuance of the later warrant, is the recent decision of the Court of Appeals in *Winters v. State,* 301 Md. 214, 482 A.2d 886 (1984). There, as here, there was an entry into a suspect premises under a first warrant. There, as here, one of the officers in the raiding party made observations that led him to apply for a subsequent search and seizure warrant. There, as here, the second warrant was issued, based largely upon the observations made in the course of the first entry. There, as here, the judge who issued the second warrant made no attempt to adjudge the constitutionality of the antecedent warrant. In disposing of a claim almost indistinguishable from the one *sub judice,* Judge Couch wrote for the Court of Appeals at 301 Md. 224, 482 A.2d 886:

"Appellant now asks this Court to expand his reading of the dicta in *Brooks* to require the issuing magistrate not only to make an independent determination of probable cause for the issuance of the second warrant, but also to determine if probable cause existed for the issuance of the first warrant, when that warrant is attached to and is an underlying fact in determining probable cause to issue

the subsequent warrant. We decline to do so because we do not think that *Brooks* requires the magistrate who issues the second warrant to determine if probable cause existed to issue the first warrant; if it did it would be contrary to law."

## Conclusion

What emerges is that the police in this case were conducting a reasonable and constitutional search of the motel room for evidence of narcotics and narcotics paraphernalia. That authorized them to search any closet, drawer, box, suitcase, or other container—including the appellant's briefcase—that might have been used to store or conceal such contraband. The appellant had standing to litigate the search of his briefcase; the appellant loses on the merits of that litigation.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.