Rockingham
No. 83-026

# THE STATE OF NEW HAMPSHIRE

### v.

# THOMAS FARAGI

August 5, 1985

*Stephen E. Merrill,* attorney general (*Andrew L. Isaac,* assistant attorney general, on the brief and orally), for the State.

*Joanne S. Green,* assistant appellate defender, of Concord, by brief and orally, for the defendant.

*Thomas Faragi,* by brief, pro se.

SOUTER, J. The defendant appeals from his conviction for first degree murder. In the appeal as originally docketed the defendant claimed through counsel that the Superior Court (*Bean,* J.) errone-

ously failed to hold a hearing on the defendant's competence to waive the defense of insanity. Thereafter, the defendant filed a brief pro se, claiming, *inter alia*, ineffective assistance of trial counsel. As to this latter issue, we remanded for evidentiary hearing and ruling. On remand, the same trial judge rejected the claim of ineffective assistance, and we have consolidated the defendant's appeal from that ruling with the appeal as first docketed. We affirm.

We will deal first with the claim of ineffective assistance. For reasons that will appear below, the only facts about the crime itself that are relevant on this issue were stated in an affidavit which the police filed when they applied for a warrant to search the defendant's house for the murder weapon. From the following summary of the affidavit's factual recitations we will omit the statements attributing items of information to the specific individuals who provided them, though we do note that the affidavit was unusually well drawn and meticulously indicated the affiant's sources.

At 9:48 a.m. on March 11, 1982, Ronald Vachon saw the injured body of Valerie Ann Blair on the ground at Odiorne State Park in Rye and observed what he thought was a yellow Buick Skylark with a black top speeding north from the scene on Route 1-A. The victim was later pronounced dead from five gunshot wounds of her face and head. Near the place where the victim's body had been, the police found spent and live .22 caliber rounds marked "CCI," the live rounds containing hollow-point long-rifle bullets. The police promptly searched for a gun on both sides of Route 1-A for three quarters of a mile·north of the park, and later searched the bed of a tidal creek that crossed that road, but without success.

On the day of the crime the defendant owned a yellow 1968 Pontiac Lemans. Four days later, on March 15, he delivered the car to a friend named Truman. On March 19, Truman allowed the police to search the car, where they found two live rounds of CCI long-rifle hollow-point ammunition. Truman and his wife had put no ammunition in the car.

Early in March 1982, the defendant had told a friend named Pickering that he possessed a .22 Ruger gun, despite an earlier felony conviction. On March 9, 1982, the defendant showed a Ruger .22 semi-automatic pistol to another friend named Cvetanovich and described the gun as "hot." Cvetanovich noticed that it was chambered for long-rifle ammunition. The defendant had mentioned a trip he expected to make to Florida, but had agreed with Cvetanovich that it would be unwise to take the gun with him. On March 10 the defendant gave his correct name but a false address to a store clerk from whom he bought a box of CCI .22 long-rifle hollow-point

ammunition. The clerk later identified the defendant as the purchaser, based on a police photograph.

On March 18, 1982, the defendant flew to Florida, where he was arrested the next day on a charge unrelated to the present one. At his arrest, he did not have the pistol with him.

On March 20, 1982, a neighbor of the defendant's in Rye said that the defendant had "recently" shown the gun to him at the neighbor's house. On March 20, Pickering and Cvetanovich stated that they had not seen the gun since March 11.

The police prepared an affidavit with the foregoing information, along with further evidence indicating that the defendant had lived at his parents' house in Rye at all relevant times. As part of the affidavit, the police submitted a composite drawing that Vachon had prepared of the face of the driver of the yellow car. The drawing resembled photographs of the defendant's face, although the affidavit disclosed that Vachon had not identified the defendant from a photographic array.

Based on the affidavit, the justice of the Rye Municipal Court issued a warrant to search the defendant's parents' house for the pistol and ammunition. While the police were executing the warrant the defendant called his father from Florida. When his father mentioned the search, the defendant told his father where he had hidden the gun and instructed his father to tell the police. The father did, and the police found the gun where the defendant had said it would be. A ballistics expert testified at trial that the defendant's gun had expelled the spent rounds found at the scene of the crime.

The defendant's trial counsel did not move to suppress the gun as evidence, because, as he later testified, his analysis of the law and the evidence convinced him that a motion to suppress would surely fail. For this decision, the defendant now seeks a new trial on the ground of ineffective assistance of counsel. He rests his claim on both the sixth amendment to the Constitution of the United States and part I, article 15 of the Constitution of New Hampshire. *See State v. Staples*, 121 N.H 959, 961–62, 431 A.2d 266, 267 (1981). For reasons stated in *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), we consider the defendant's claim first and independently under the State Constitution, citing decisions of the Supreme Court of the United States and of courts of other jurisdictions only for their help in analyzing and deciding the State issues. *See Michigan v. Long*, 103 S. Ct. 3469, 3475–76 (1983).

 Both Constitutions measure the defendant's right to assistance of counsel under an objective standard of reasonable competence. *Breest v. Perrin*, 125 N.H. 703, 705, 484 A.2d 1192, 1194

(1984); *Strickland v. Washington,* 104 S. Ct. 2052, 2064–65, *reh'g denied,* 104 S. Ct. 3562 (1984); *cf. Abbott v. Potter,* 125 N.H. 257, 480 A.2d 118 (1984) (special rule when counsel's conflict of interest is alleged in multiple representation case). Reviewing courts start with the strong presumption that counsel's conduct falls within the limits of reasonable practice, *Breest v. Perrin supra,* bearing in mind the limitless variety of strategic and tactical decisions that counsel must make. *See Abbott v. Potter supra.*

■■ Even when professional competence falls below that objective standard, however, a defendant must also demonstrate that he has actually been prejudiced thereby, before he is entitled to a new trial. *Breest v. Perrin, supra* at 705–06, 484 A.2d at 1194–95; *cf. Abbott v. Potter supra.* If the defendant is unable to demonstrate such prejudice, we need not even decide whether counsel's performance fell below the standard of reasonable competence. *Strickland v. Washington, supra* at 2069–70. On this issue of prejudice, counsel for the defendant has read our earlier case of *State v. Staples supra* as shifting the burden to the State to prove beyond a reasonable doubt that any deficiency of representation was harmless, once such a deficiency had been established. More recently, however, we have followed the standard set out in *Strickland v. Washington supra,* that the burden rests on the defendant to demonstrate "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Breest v. Perrin, supra* at 706, 484 A.2d at 1194–95 (quoting *Strickland v. Washington, supra* at 2068).

We address the issue of prejudice first. On the facts of this case the defendant could not raise a reasonable probability of a different outcome without demonstrating that the gun, and the ballistics analysis based on the examination of the gun, could have been excluded from the evidence. The issue may be focused, then, by considering whether a motion to suppress the gun as the fruit of an unlawful search would have been successful.

■ An examination of the State's application for the search warrant in the light of the applicable constitutional standard convinces us that a motion to suppress would have had no merit. The State must support an application for a search warrant "with evidence of probable cause in order to demonstrate to the issuing magistrate that there is a substantial likelihood of finding incriminating evidence at the place to be searched." *State v. Maya,* 126 N.H. 590, 596, 493 A.2d 1139, 1144 (1985); *State v. Marcotte,* 123 N.H. 245, 248, 459 A.2d 278, 280 (1983).

The affidavit in the present case satisfied this standard. At the time the magistrate issued the warrant in this case, a person of ordinary caution would have been justified in drawing the following inferences from the affidavit summarized above: the defendant owned the murder weapon, which he had carelessly loaded in his car with ammunition purchased the day before the murder; he shot the victim and fled from the scene in his car; after the murder he became cautious about exhibiting the gun, but he did not dispose of it or take it to Florida with him; the gun was probably in the house where the defendant lived at the time of the murder.

The defendant does not dispute the soundness of any of these conclusions except the last, that nine days after the murder the gun was probably at the defendant's house. The defendant's only authority for challenging this inference is the following statement from the opinion in *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979):

> "Common sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone. If defendant shot [the victim], as the affidavit states, one of the first things he would do would be to get rid of the gun. The handgun could easily have been disposed of permanently within a short time after the crime. It is not reasonable to infer that defendant drove [home from the crime scene] and then casually placed a weapon which had fired more than one bullet into a man on the shelf in his bedroom closet. Ballistics is not only an accurate science, it is also well known."

The defendant's reliance is misplaced, however. For, in spite of our great respect for the Court of Appeals for the First Circuit, we are unable to accept the quoted statement as a reflection of the criminal mind in the case before us. The defendant in *Charest* was suspected of shooting a known acquaintance in the presence of three witnesses, and he would therefore have expected the police to try to connect him with a gun. In this case, however, there is no positive indication that the defendant knew he had been seen, and four days after the murder he was so cavalier about the possibility of identification that he apparently sold his car without examining it for possible evidence, like the live rounds of ammunition, that could link him to the crime. Whatever one's view of the *Charest* case, then, it is not on point here.

Rather, we are persuaded that a different generalization fits these facts:

"Where the object of the search is a weapon used in the crime . . . the inference that the item [is] at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police."

1 W. LAFAVE, SEARCH AND SEIZURE, A TREATISE ON THE FOURTH AMENDMENT § 3.7, at 709 (1978).

This interpretation is merely the extension of the general rule that "[f]ew places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime." *State v. Moran*, 141 Vt. 10, 17, 444 A.2d 879, 882 (1982) (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. 1981)). The same is true of instrumentalities of crime, since "people who own pistols generally keep them at home or on their persons." *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975). In the present case, of course, the likelihood that the gun was at the house was all the stronger in the light of the unsuccessful efforts to find it and the knowledge that the defendant did not have it when arrested in Florida.

■ Thus, we conclude that the affidavit unquestionably established probable cause to believe that the gun was at the defendant's house. The analysis and the result would be no different under the fourth amendment, and we therefore will not discuss the federal claim separately. *See State v. Ball*, 124 N.H. at 232, 471 A.2d at 351. Given these conclusions we need not consider the State's alternative arguments that the defendant had consented to the search by directing his father to produce the gun, that the warrant was valid as a warrant to search for ammunition, or that the gun would in any case have been admissible as impeachment evidence in response to the defendant's alibi testimony.

■ Since we have found the warrant valid and the gun admissible, it follows that the defendant cannot demonstrate prejudice resulting from a failure to file a suppression motion, and in the absence of any such prejudice there is no possibility of a new trial on grounds of ineffective assistance of counsel. We therefore need discuss this issue no further, and leave it with the observation that the defendant's trial counsel deserves credit for a sensible analysis of the suppression issue and a refusal to waste time and money in pressing what would have been a hopeless motion to suppress.

Having thus concluded that defense counsel made no error calling for a new trial, we turn to consider the defendant's second claim on this appeal, that the trial judge erred in accepting the defendant's withdrawal of the insanity defense and waiver of his right to the

second segment of a bifurcated trial on that issue. In pressing this claim, the defendant relies on federal cases and makes no argument for relief under the State Constitution. We accordingly treat any State claim as waived and proceed to consider the application of federal standards only. *State v. Reynolds*, 124 N.H. 428, 432, 471 A.2d 1172, 1173–74 (1984).

Initially we must note the procedural irregularity of our present consideration of this claim. At trial, the defendant chose to waive the insanity defense. Since then he has not sought a new trial, a belated trial on insanity, or any relief by collateral proceedings. He simply takes the position here that the trial judge committed error by failing to act *sua sponte* to inquire further than he did into the defendant's competency to waive that defense. The defendant has not, however, cited any federal authority absolving him from a threshold obligation to plead that his waiver was constitutionally tainted and to go forward with evidence in support of that claim. *See Zapata v. Estelle*, 585 F.2d 750, 751–52 (5th Cir. 1978); *State v. LaRoche*, 117 N.H. 127, 131, 370 A.2d 631, 633–34 (1977). While it would therefore be proper for us to decline to rule on the issue, *see Daboul v. Town of Hampton*, 124 N.H. 307, 309, 471 A.2d 1148, 1149 (1983), we understand the defendant's position to be that the existing record would entitle him to a new trial or belated trial on insanity. Since we are satisfied that there is no merit in this position, we will consider it now, rather than remand or dismiss this portion of the appeal with leave to proceed further in the superior court.

The facts relating to this issue may be stated briefly. The defendant originally gave notice of intent to plead insanity as a defense, *see* RSA 628:2, III (Supp. 1983), and requested that the trial be bifurcated for separate determinations of guilt and sanity. *See Novosel v. Helgemoe*, 118 N.H. 115, 384 A.2d 124 (1978). After the verdict of guilty the defendant conferred with his counsel, who advised him to proceed with the second part of the trial on the insanity defense. The defendant, however, decided to withdraw his claim of the affirmative defense of insanity and, therefore, to waive the second part of the bifurcated trial. After counsel had informed the court of the decision, the trial judge questioned the defendant and his counsel about it.

Before describing these colloquies in detail, it will be helpful to consider the constitutional standard that the defendant invokes to support his claim that the trial court made an insufficient inquiry into the defendant's competence before accepting the withdrawal of the defense and waiver of further trial. He relies upon *Pate v. Robinson*, 383 U.S. 357 (1966), for the rule that due process requires a trial court to inquire *sua sponte* into a defendant's competence if

evidence before the court raises a "bona fide doubt," *id.* at 385, or constitutes "reasonable cause" to believe that a defendant is unfit to proceed, *Drope v. Missouri*, 420 U.S. 162, 173 (1975).

Strictly read, however, *Pate* and *Drope* passed on the constitutional adequacy of State procedures for inquiring into competency; those cases did not set threshold standards of due process. *Cf. State v. Bertrand*, 123 N.H. 716, 725, 465 A.2d 912, 914 (1983) (adopting the rule approved in *Pate* as an affirmative requirement of the State Constitution). In any case, it is clear that if *Pate* is followed the requirements of federal due process will be satisfied.

The application of *Pate* necessarily depends on the content of further standards, however; those for defining and determining competence itself. For the higher and more demanding the standard of competence, the less evidence would be required to raise a reasonable or bona fide doubt about the competence of a given defendant. Thus the defendant cites *Dusky v. United States*, 362 U.S. 402 (1960), for the basic rule that a defendant is competent to stand trial if (1) he is able to consult with his attorney with a reasonable degree of rational understanding, and (2) he has a rational as well as factual understanding of the proceedings against him. *Id.* at 402. But the defendant goes beyond *Dusky* to claim the benefit of what he believes is an even higher standard, by arguing that any waiver of the insanity defense is a waiver of a constitutional right, which requires the ability "to make a reasoned choice among the alternatives presented and to understand the nature and consequences of the waiver." *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981).

By invoking the *Chavez* rule, that the constitutional standard of competence varies with the trial decision in question, the defendant asks us to run counter to the great weight of federal authority. *See Allard v. Helgemoe*, 572 F.2d 1, 4 (1st Cir.), *cert. denied*, 439 U.S. 858 (1978). In *Allard* the Court of Appeals for the First Circuit rejected the claim that competence to stand trial under *Dusky* is not necessarily competence to plead guilty, and we likewise rejected the possibility of a dual standard in *Roy v. Perrin*, 122 N.H. 88, 94, 441 A.2d 1151, 1155 (1982). We believe that a separate standard for judging competence to waive an insanity defense would be equally erroneous for the purpose of applying federal standards of due process. The waivers of rights implicated by a guilty plea are not simpler to understand or less significant to a defendant than the implications of a decision to withdraw a defense of insanity and to waive the second part of a bifurcated trial on that issue. Thus we hold that *Dusky* provides the appropriate standard against which the existence of reasonable doubt about competence must be

assessed. The case before us does not, however, turn on this holding, for the result would be the same whether we assessed competence, and the court's actions, under *Dusky* or under *Chavez*.

With this background, we turn to the threshold questions of whether and to what extent the evidence before the trial judge ever put competence in issue. That is, did the evidence create a bona fide doubt or amount to reasonable cause to doubt the defendant's competence?

In this case the only evidence raising any question about competence was the defendant's own statement to the trial judge at the time he indicated his withdrawal or waiver of the insanity defense. When the judge asked if the defendant was under the influence of any alcohol or drugs, the defendant answered "It's possible." On further questioning he told the court that eight hours earlier, about eight o'clock that morning, he had smoked marijuana and taken a drug that he could not identify.

We think it is questionable whether these statements, standing alone, raised either a bona fide doubt or reasonable basis to doubt the defendant's competence, but we are satisfied that there could have been no reasonable doubt after a consideration of the full evidentiary record bearing on the defendant's competence. The trial judge had before him reports of two psychiatrists who had examined the defendant before trial and had found him competent. Defense counsel stated on the record that he had been in close contact with the defendant for at least the preceding six hours on the day in question and had noticed no unusual behavior. He stated that to his knowledge the defendant had taken no drugs or alcohol that would affect his thinking and that in his opinion the defendant was "not under the influence of any drugs or intoxicants." Counsel stated affirmatively that the defendant appeared to be "rational, able to converse, understand questions [and] respond to them appropriately." This testimony of counsel is perhaps the more significant because, as we noted, counsel disagreed with the defendant's decision to waive the insanity defense, and had advised against doing so.

The defendant's own statements on the record, though not extensive, do nothing to weaken the force of this evidence. He stated that he waived the insanity defense, that he was doing so of his own free will and that he believed he knew what he was doing. After the colloquy about drugs, the judge asked if he understood that he was "not raising the defense of insanity by asking for a bifurcated trial," and the defendant answered affirmatively.

In summary, the trial judge had before him only a tentative speculation that the defendant might be under the influence of

drugs. As against this, defense counsel's factual and opinion testimony indicated that the defendant was not under any such influence and that his mental condition was not different from what two examining psychiatrists had found before trial. The defendant's own responses to the court suggested no impairment. The judge was able to assess all of this evidence in the light of his observation of the defendant on and off the stand through five days of trial. We conclude from this that the evidence raised no reasonable doubt about competence whether judged under *Dusky* or under *Chavez*. We see no basis to argue that the judge should have carried the inquiry any further, and we hold that the record supports the court's finding that the defendant "voluntarily and intelligently and knowingly" waived his right to claim insanity and to have the second segment of a bifurcated trial on that issue.

Before concluding this opinion, we note that the defendant filed his own pro se brief raising issues that his appellate counsel found to have no merit. He argued that trial counsel had been deficient in failing to object to the introduction of a certain photograph, to object to testimony from a supposedly surprise witness, to cross-examine one witness effectively and to investigate the case or consult sufficiently with the defendant before trial. Some of these arguments obviously rest on the defendant's failure to recognize the latitude on matters of tactics that the *Strickland* standard recognizes as necessary, and none of them has sufficient merit to warrant extended discussion. Finally, the defendant argues that the trial court committed error in allowing an expert medical witness to testify about the possibility that certain wounds on the victim's hand were caused by impact of a .22 Ruger pistol during recoil. The witness, however, testified only that the wounds were consistent with impact on recoil and admitted that they could have been caused by other means. He did not exceed the scope of his qualifications, and there was no error.

*Affirmed.*

All concurred.