Merrimack
No. 92-641

THE STATE OF NEW HAMPSHIRE

v.

SHAYNE PITTS

December 28, 1993

*Jeffrey R. Howard*, attorney general (*Cynthia L. White*, assistant attorney general, on the brief and orally), for the State.

*Timothy M. Landry*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

Johnson, J.   The defendant, Shayne Pitts, moved for a new trial on the basis of ineffective assistance of counsel after a jury convicted him of second degree murder. The Superior Court (*Manias*, J.) denied the motion, and Pitts appealed. We affirm.

The investigation that led to Pitts' arrest began on January 11, 1991, after his girlfriend, Melody Derosia-Waters, failed to board a plane for West Virginia as planned. She was pregnant at the time. Pitts told police officers, friends, and family members that he dropped Derosia-Waters off at the Manchester airport at around two o'clock that afternoon and never saw or heard from her again.

Three months later, police officers found Derosia-Waters' body in the root cellar of Pitts' parents' home, where Pitts had been living on January 11. The body was shrouded in a blanket and buried beneath two feet of dirt, a piece of plywood, and a pile of wood and debris. The officers were able to find her only after using a police dog specially trained to detect the odor of human decomposition. Her wrists were bound to her waist with electrical wire that had been threaded through her belt loop.

An autopsy performed the next morning revealed that Derosia-Waters died as a result of three gunshot wounds. Two .32 caliber bullets were recovered from her body, while a third was later found in the sub-flooring of Pitts' bedroom. One bullet entered her back, severing her spine and piercing her aorta. The other two criss-crossed through her brain. The medical examiner determined that one of these latter gunshots was a contact wound; that is, the barrel

of the gun had been pressed against Derosia-Waters' head when the gun was fired.

Meanwhile, the discovery of Derosia-Waters' body in his parents' cellar prompted Pitts to tell his mother, two uncles, and a friend that he had killed his girlfriend with a .32 caliber handgun while involuntarily under the influence of the hallucinogenic drug LSD. Rather than flee the police, Pitts decided to turn himself in. He met with his mother's divorce attorney on the same day as the autopsy, a Saturday, and repeated his story. Pitts' mother paid the attorney a $1,000 retainer and agreed to another $24,000 in fees and $10,000 in costs. Later, Pitts' mother paid the $24,000, and the attorney agreed to forgo the extra $10,000.

The Saturday meeting lasted six hours. During that time, the attorney telephoned the police and learned that warrants were being sought for Pitts' arrest and possibly for a search of Pitts' parents' home. It appeared that the police knew Pitts owned a .32 caliber gun and were looking for it. Upon the attorney's advice, Pitts agreed to turn over the gun to the police that evening. The next day, Pitts met with the attorney again for several more hours. They spent most of the day working on a statement in which Pitts confessed to killing and burying Derosia-Waters while involuntarily intoxicated with LSD. The statement asserted that Derosia-Waters had "dosed" Pitts with LSD without his knowledge and implied that she had been under the influence of the drug herself that night. Upon the attorney's advice, he and Pitts brought the statement to the police station, where Pitts verified its accuracy. The police then arrested him for first degree murder.

Approximately three weeks later, Pitts, his attorney, and an official of a publishing company signed a contract transferring to the company Pitts' media interests "in any matter pertaining to the case of *The State of New Hampshire v. Shayne Pitts.*" Pursuant to the contract, the company would receive ten percent of all income generated from the sale of his story and expenses up to an additional five percent of such sales. The contract then provided:

> "Shayne Pitts, or a non-profit foundation established by Shayne Pitts, shall receive Fifty Percent (50%) of the payments received after the Company and costs have been paid.
>
> [Pitts'] [a]ttorney . . . shall receive Fifty Percent (50%) of the payments received, after the Company and costs have been paid, *which sum shall be applied to the costs associated with the defense of Shayne Pitts* in the matter of *The State of New Hampshire v. Shayne Pitts.*"

(Emphasis added.) Media interest in Pitts' case soon waned, and no money was ever generated under the contract.

Before trial, toxicologist Dr. Rieders tested samples of Derosia-Waters' body for LSD. He performed three different tests. Together, the first two indicated that LSD was present in the samples, while the third was inconclusive. Dr. Rieders concluded that LSD was present in Derosia-Waters' blood.

At trial, Pitts admitted that he shot and buried Derosia-Waters but claimed that involuntary intoxication rendered him innocent of all forms of homicide. Thus, the only disputed element of the offense charged was Pitts' state of mind at the time of the killing. To establish this element, the State presented evidence that Pitts learned of Derosia-Waters' pregnancy the day before her death and argued with her about it, telling her to have an abortion and disputing that he had impregnated her. Derosia-Waters apparently insisted that Pitts was the father and refused to abort the purported product of their union. The State also introduced evidence that on the same day, Pitts discovered what appeared to be a love letter that Derosia-Waters had recently written to an old boyfriend. Moreover, the State presented the details of the gunshot wounds and burial described above, along with ballistics evidence that the bullets recovered were fired from Pitts' gun. An expert also testified that a person wishing to fire more than two bullets from Pitts' gun would have to perform several discrete reloading steps before doing so, each of which would apparently necessitate fine motor control. Two other experts testified that persons intoxicated with LSD suffer a loss of fine motor control.

Pitts' attorney did not call Dr. Rieders as a witness and was unable to introduce into evidence Dr. Rieders' report stating that LSD was present in Derosia-Waters' blood. Two medical experts discussed Dr. Rieders' conclusion in front of the jury, but only one of them, Dr. Smith, agreed with it. Dr. Kaplan, the forensic pathologist who performed the autopsy on Derosia-Waters' body, testified that while he believed it was *possible* Derosia-Waters was under the influence of LSD at the time of her death, he did not think it *probable*, as Dr. Rieders had stated in his report. Dr. Kaplan opined that the third, inconclusive LSD test performed on the body samples was the "gold standard" test for forensic toxicology studies. Accordingly, the inconclusive result led him to discount the first two tests' positive results. Pitts' attorney presented no evidence to rebut Dr. Kaplan's assessment of this third LSD test.

The jury returned a verdict of not guilty on the charge of first degree murder but convicted Pitts of second degree murder, and the

court sentenced Pitts to forty years to life in prison. Pitts retained new counsel and moved for a new trial on the basis of ineffective assistance of trial counsel. One of Pitts' main claims of ineffectiveness involved the decisions of Pitts' trial counsel not to depose Dr. Kaplan and not to call Dr. Rieders to rebut Dr. Kaplan's testimony. Pitts contends that Dr. Rieders' report was critical to the defense because it provided the only physical evidence corroborating Pitts' claim of involuntary LSD intoxication.

At the hearing on Pitts' motion, Dr. Rieders testified that he would have given a deposition or spoken with defense counsel if he had been called, and he stated that the third LSD test he performed was an experimental test whose inconclusive results did not rule out the presence of LSD in the body samples. Pitts' trial attorney testified that he discussed Dr. Rieders' report with his medical experts and chose not to call Dr. Rieders to rebut Dr. Kaplan's testimony because he felt that portions of Dr. Rieders' report could prove damaging. For example, Dr. Rieders admitted that he did not know whether Derosia-Waters had been voluntarily or involuntarily under the influence of LSD at the time of her death, or whether LSD had only leached into her body from a pocket of her clothing after her death. Moreover, he did not know whether Derosia-Waters had last taken LSD one or two days before her death, or whether she had ingested the drug so close to the time of her death that it never took effect. The superior court denied Pitts' motion for a new trial, finding neither ineffectiveness nor prejudice, and Pitts appealed, arguing that he was denied his State and federal constitutional rights to effective assistance of counsel.

The first issue we address is Pitts' argument that his trial attorney rendered ineffective assistance by advising him to confess to the act of killing Derosia-Waters without first adequately investigating the State's case. The State and federal standards we must use to address this claim are identical. *State v. Glidden*, 127 N.H. 359, 361, 499 A.2d 1349, 1350 (1985). "Therefore, while we decide the State issue independently, using federal precedent only for its help in dealing with the State issue, the analysis and result is the same under each constitution." *Id.* (citations omitted).

The proper standard to apply is the one set forth in *State v. Faragi*, 127 N.H. 1, 4–5, 498 A.2d 723, 726 (1985), and *Strickland v. Washington*, 466 U.S. 668, 687 (1984). That is, Pitts must

"[f]irst . . . show that counsel's performance was deficient, which requires proof that counsel made such egregious errors that counsel was not functioning as the 'counsel' guar-

anteed by both constitutions. *See Strickland,* 466 U.S. at 687. Second, the defendant must prove that counsel's conduct actually prejudiced the defendant such that there is a reasonable probability that the result of the proceeding would have been different had counsel been competent. *Strickland,* 466 U.S. at 687; *Faragi,* 127 N.H. at 5, 498 A.2d at 726."

*State v. Fennell,* 133 N.H. 402, 405, 578 A.2d 329, 331 (1990). "The key to an ineffective assistance of counsel claim is a showing of actual prejudice." *Humphrey v. Cunningham, Warden,* 133 N.H. 727, 733, 584 A.2d 763, 767 (1990). Because we find that Pitts "is unable to demonstrate such prejudice, we need not even decide whether [his attorney's] performance fell below the standard of reasonable competence." *Faragi,* 127 N.H. at 5, 498 A.2d at 726.

■ Pitts makes three claims of prejudice resulting from his trial attorney's advice to make a written statement to the police confessing the act of fatally shooting Derosia-Waters. First, Pitts asserts that "by providing the State with its best evidence, defense counsel sacrificed the defendant's right to have the State prove all elements of the crime at a bifurcated trial." Pitts argues that "[h]is admission to the shooting provided the State with an insurmountable case on the actus re[u]s of murder." Pitts also states that "[h]is admission to the cover-up gave the State a potent case on intent." A written statement confessing to the act of killing a person does not relieve the State of its burden of proof or deprive a defendant of the right to a bifurcated trial.

■ Second, Pitts contends that

"the statement severely weakened any posture Pitts might have had at negotiating a plea . . . . Had the State not been provided with the defendant's confession, there is a reasonable probability that they would have offered a negotiated plea offer greatly less than the eventual sentence of 40 years to life in prison."

This argument is grounded in sheer speculation. Pitts has provided no evidence to substantiate it, such as testimony of the attorney general's office concerning the State's plea intentions. We therefore reject it. Moreover, in light of all the other evidence the State possessed, the confession was not essential to the State's case. Thus, it is not likely the State would have offered to negotiate a plea.

■ Third, Pitts maintains that he "was prejudiced by his statement where it was used to impeach minor inconsistencies in his testi-

mony." We agree with Pitts that the inconsistencies were minor. After reviewing all the evidence presented below, we conclude that the State's impeachment did not substantially weaken Pitts' credibility. The jury, after all, acquitted Pitts of *intentionally* killing Derosia-Waters, and instead convicted him of *knowingly* taking her life. Pitts' trial attorney's advice to make a written statement does not undermine our confidence in the reliability of the jury's verdict. *Cf. Faragi*, 127 N.H. at 5, 498 A.2d at 726.

■ The second issue we address is whether Pitts' trial attorney was "constitutionally ineffective . . . where he failed to depose [Dr. Kaplan] and then failed to call a rebuttal witness once it became clear that [Dr. Kaplan] had given damaging and misleading testimony regarding the significance of [Dr. Rieders'] toxicology report[.]" Again, the parties agree that we should employ the *Faragi/Strickland* standard and again, we do not address the effectiveness prong of the test because we find no prejudice. Although deposing Dr. Kaplan would have reduced the element of surprise, it is not probable that discovering Dr. Kaplan's disagreement with Dr. Rieders' toxicology conclusion prior to trial would have changed the outcome of the trial.

Pitts suggests that such prior knowledge would have or should have prompted his trial attorney to call Dr. Rieders as a rebuttal witness. As described above, however, Dr. Rieders' findings could have proved damaging to Pitts during cross-examination. Moreover, one of Pitts' medical experts, Dr. Smith, testified after Dr. Kaplan and agreed with Dr. Rieders' conclusion. Finally, although Dr. Rieders' test results comprised the only physical evidence that LSD was in Derosia-Waters' bloodstream at the time of her death, the record contains several references to her propensity to use the drug. And, of course, the real issue at trial was not whether Derosia-Waters was intoxicated at the time of her death, but whether Pitts was. Hence, we cannot agree that there is "a reasonable probability" that, but for the attorney's actions, "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694.

Finally, we address Pitts' claim that

> "defense counsel was burdened by an actual conflict of interest that adversely affected his representation of [Pitts] where counsel (1) unsuccessfully relied on proceeds from a media contract to finance the costs of the defense, and (2) conducted the defense in a fashion detrimental to [Pitts] in order to maximize the benefit to him from that contract . . . ."

The standard to be used to analyze this argument is the one set forth in *State v. Cyrs*, 129 N.H. 497, 529 A.2d 947 (1987), and *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980). Again, the State and federal standards are identical. Accordingly, while we make an independent determination of Pitts' claim under the State Constitution, *see State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), the analysis and result is the same under each constitution.

■■ Where a defendant has not objected at trial that his attorney is operating under a conflict of interest, he "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. A defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cyrs*, 129 N.H. at 501, 529 A.2d at 950 (quotation omitted). As we stated in *State v. Hopps*, 127 N.H. 133, 136, 500 A.2d 355, 356–57 (1985), in the context of multiple representation:

> "The United States Court of Appeals for the First Circuit has explained that relief under the rule in *Cuyler* requires proof of two elements: (a) some plausible alternative defense strategy or tactic that trial counsel might have pursued; and (b) an inherent conflict between that alternative defense and other demands and interests arising from counsel's representation of another person. *Brien v. United States*, [695 F.2d 10, 15 (1st Cir. 1982)]."

Pitts argues that "[c]ounsel's reliance on the media contract caused him to run out of funds for the defense of his client," leaving the attorney unable to pay for a deposition or an extra expert witness. Although we do not condone the attorney's decision to sign the media contract with his client, *see* N.H. R. PROF. CONDUCT 1.8(d), we are at a loss to understand how any aspect of the contract *caused* his attorney to run out of funds for an adequate defense. The attorney ran out of money not because of the media contract, but because he used up all the money Pitts' mother had agreed to pay him. Pitts makes no assertion that, *without* a media contract, his attorney would somehow have had more money to spend on the defense. Accordingly, there was no conflict, and Pitts' claim must fail.

Pitts also argues that by relying on the LSD defense at trial, his attorney

> "employed a defense 'strategy' that sensationalized [Pitts'] case. Counsel did so rather than employ other plausible defense strategies that were in conflict with counsel's interest

in sensationalizing the case [and thus generating money under the media contract]. Counsel could have sought to suppress the defendant's statement and then argued the defendant's case at a bifurcated trial."

Again, we fail to see the causal connection between the attorney's decision to sign the media contract and his decision to employ the LSD defense. As the trial court pointed out, the LSD defense originated with Pitts, not his attorney, and the decision to use it was made approximately three weeks *before* the media contract was signed. The attorney's advice to make a written statement to the police supports the idea that this defense decision was not a tentative one. The attorney planned to — and did — use the statement at trial to argue that, once Derosia-Waters' body was found, Pitts "came clean" immediately and consistently told the truth thereafter. Moreover, once the attorney advised Pitts to make the written statement, it would have been extremely difficult to proceed at trial with any other defense but the one he used. Pitts' argument that his attorney may have been thinking about making a media contract before he advised Pitts to make the statement is completely speculative and unsupported by any evidence. Thus, we reject Pitts' claim that the media contract caused his attorney to use the LSD defense rather than another, less sensational one and conclude again that there was no conflict.

*Affirmed.*

All concurred.