712 A.2d 534

**STATE of Maryland.**

v.

**Gary R. WARD.**

**No. 35, Sept. Term, 1997.**

Court of Appeals of Maryland.

July 1, 1998.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Petitioner.

Brian J. Murphy, Baltimore, for Respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

RODOWSKY, Judge.

The issue in this search warrant case is whether there was probable cause to believe that instrumentalities and evidence of a street murder could be found in the residence and/or motor vehicle of the person identified as the murderer. As explained below, we hold that there was probable cause.

Shortly before 11:30 p.m. on Wednesday, September 30, 1992, Alfred Stewart (Stewart) was shot a number of times and killed on a public street in Baltimore City. Over the next two days persons who would not identify themselves telephoned the police stating that the respondent, Gary R. Ward (Ward), had murdered Stewart. Ward was brought to police headquarters for questioning, and his automobile was towed there. Ward was not charged at the time, but the police would not allow Ward to drive his car away because its license tags had expired. Three days after the murder an eyewitness identified Ward in a photographic array as Stewart's killer. The police then obtained the subject warrant to search Ward's home and automobile. Seized in the search of the automobile were three .357 "MAG" hollow point cartridges. These were introduced into evidence by the State at Ward's trial on charges of murder in the first degree and of using a handgun in the commission of a crime of violence.

That trial was conducted in November 1993. Ward was convicted and sentenced to life imprisonment. On appeal, the Court of Special Appeals, in an unreported opinion dated November 9, 1994, remanded for the limited purpose of holding a suppression hearing.[1] On remand the Circuit Court for Baltimore City conducted a hearing and denied the motion to suppress in September 1995. Ward again appealed, and the Court of Special Appeals reversed in an unreported opinion

---

1. The trial court had concluded that no suppression hearing was required in the criminal cause involving the murder of Stewart because the evidence seized that was to be offered in the Stewart murder trial had been the subject of a suppression hearing in a criminal cause against Ward involving a shooting on September 17, 1992. The motion to suppress in that other cause had been denied.

filed January 7, 1997. That court concluded "that the search warrant was invalid because the affidavit lacked information of nexus between the item sought and the place to be searched." The State moved for reconsideration, contending that the opinion of January 7, 1997, conflicted with the opinion of November 9, 1994. That motion was denied in an unreported opinion filed March 20, 1997, in which the court held "that there was nothing in the warrant documents upon which the officer could have based objectively reasonable reliance that the automobile contained evidence of the crime involved."

We granted the State's petition for certiorari. That petition raises only the nexus issue.

Application for the search warrant here involved was made on October 4, 1992, four days after the Stewart murder. The affiant was a detective of the homicide unit of the Baltimore City Police. His thirteen years' experience included work in the drug enforcement and vice units. The warrant sought was to search "[a] two (2) story row-type dwelling" located at 1634 Darley Avenue in Baltimore City and a 1983 Oldsmobile Cutlass, described by tag number, serial number, and color. Set forth in the margin is the text of the affidavit, excluding those portions describing the places to be searched and the background of the affiant.[2]

---

**2.** The affidavit, in substantial part, reads:

"Your affiant does hereby state the following. On 30 September 1992 at 2325 hrs, P/O Bruce Ridley of the Eastern District responded to the 1400 Blk Cliftview Ave for a shooting. Upon his arrival he observed the victim later identified as Alfred [S]tewart, lying in the street between two (2) parked cars, suffering from multiple GSW'S To the body. BFD Medic # 3 responded to the scene and pronounced the victim dead at 2337 Hrs. At 2351 Hrs your affiant arrived on the scene and took charge of the investigation. Several anonymous telephone calls were received in the Homicide office on 1–2 October 1992 in reference to the recent homicide, all the calls indicated that a Gary Ward B/M/20–21 yrs of the 1600 Blk of Darley Ave was responsible for the death of the victim. Gary Ricardo Ward has an arrest record with the Baltimore City Police Department under B of I # 374–587 to include handgun Violations. On 2 October 1992 at approx 2030 hrs Gary Ward was brought into the Homicide office and his 1983 Olds Cutlass, black in color was towed into the head-quarters building. Mr. Ward was interviewed but was released due

*United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), directs how the affidavit is to be read by courts reviewing the magistrate's decision to issue a search warrant.

> "If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants ... must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

*Id.* at 108, 85 S.Ct. at 746, 13 L.Ed.2d at 689.

## I. The Inferences

With the foregoing guidance in mind, we turn to a review of the affidavit in the instant matter. Stewart was shot late on the evening of September 30, 1992, in the 1400 block of Cliftview Avenue in the Eastern District of the Baltimore City Police Department. Inasmuch as the cause of death was multiple gunshot wounds and his body was found lying between two parked cars, the inference is that Stewart was

---

to the lack of any eyewitnesses. Ward's vehicle was kept at the Police building due to expired Tags. On 3 October 1992 a witness was developed who picked out the photograph of Gary Ward from a photographic line-up card. The witness chose the photograph of B of I # 374–587 and positively identified the suspect as the person responsible for the death of the victim on 30 September 1992.

"The suspect Gary Ward gave the address of 1634 Darley Ave as his home address. The vehicle a 1983 Olds Cutlass Maryland Tag ZWH075 is listed to Mr Ward at the 1634 Darley Ave address. Your affiant prays that a search and seizure warrant be issued for the above listed location and vehicle. Your affiant believes that probable cause exists to believe that there is evidence relating to the crime of Murder being stored at 1634 Darley Ave and the 1983 OLDS Cutlass Maryland Tag # ZWH–075. Therefore, your affiant prays that a search and seizure warrant be issued for the said premise and vehicle."

gunned down on the public street. The warrant authorized a search for, *inter alia*, "Handguns, Ammunition, Personal Papers showing ownership/possession of a firearm." It is self-evident that the murder weapon was not found at the crime scene.

The fact that the first of the witnesses who telephoned the police would not identify themselves is significant. These witnesses knew Ward by sight and name. There was no information from any caller that the murderer was a person other than Ward. Ward, age twenty to twenty-one, had an arrest record that included two or more handgun "[v]iolations." All of this information permitted the magistrate to infer that these witnesses were unwilling to identify themselves because they feared Ward. The affidavit described Ward, not in terms but in reasonable inference, as a person to whom a handgun and ammunition are items of utility and value. Consequently, the magistrate could infer a reasonable probability that, between the murder and the application for the warrant, Ward had not disposed of the murder weapon and that Ward would be even less likely to have disposed of the weapon's less incriminating bullets.

The magistrate further could infer that the weapon was not on Ward's person when he was brought in for questioning less than forty-eight hours after the murder. As a matter of self-protection the police most certainly would have done a pat-down for weapons when they accosted Ward, and the police were still looking for the murder weapon when they applied for the warrant. Apparently Ward was accosted when he was in or about his automobile, inasmuch as the police towed that automobile to headquarters while Ward was transported to headquarters by other means. Thus, the weapon was not in plain view in Ward's automobile when the police towed it.

Under the authorities reviewed below, the magistrate had probable cause to believe that the murder weapon and associated evidence of the crime of murdering Stewart could be found in Ward's home and/or in his automobile, but out of

view. Because more court decisions deal with residences than with automobiles, we shall review the residence cases first.

## II. The Residence

■ That there was probable cause to find a nexus in the instant matter is supported by *Mills v. State*, 278 Md. 262, 363 A.2d 491 (1976).

Mills was convicted of kidnapping two women and of raping and robbing one of them. He was arrested on the day following the crimes when he was identified by the rape victim while he was on a public street. The crimes had been effected by threatening the victims with a hunting knife which was not on Mills's person when he was arrested. The victims were able to give a detailed description of the knife which the police seized under a warrant, issued after Mills's arrest, for the search of his residence. Mills contended, *inter alia*, on appeal to the Court of Special Appeals that there was no probable cause for the search. *Mills v. State*, 28 Md.App. 300, 303, 345 A.2d 127, 129–30 (1975). The opinion by the Court of Special Appeals does not quote from the application for the warrant, but the court upheld the search on the following rationale:

"The remaining question is, therefore, whether the affidavit as presented demonstrated probable cause within its four corners, as required. We think that the law in Maryland is clear in this regard. In *Grimm v. State*, 6 Md.App. 321, 251 A.2d 230 (1969), *cert. denied* 397 U.S. 1001[, 90 S.Ct. 1150, 25 L.Ed.2d 412] (1970) and *Reidy v. State*, 8 Md.App. 169, 259 A.2d 66 (1969) this Court found no defects in warrants issued to search residences where weapons used in the commission of recent crimes could reasonably be found. Chief Judge Murphy, in *Reidy*, where the affidavit related that an individual had been shot with a .22 caliber weapon and that there was a witness to the crime who identified the defendant as the perpetrator, observed:

" 'We think that it was reasonable, given the information set out in the application for the warrant, for police to believe that the gun used in the crime could be found in appellant's house.' [Citing *Grimm.*]

"We reach the same conclusion concerning the knife and sheath in the instant case and therefore find no error in their admission."

*Id.* at 305, 345 A.2d at 130–31.

This Court granted certiorari in *Mills* and affirmed. The opinion summarized the affidavit which described in detail the offense, the arrest of Mills, the knife, and the place to be searched. The only express facts dealing with the nexus between the knife and Mills's residence was that Mills, when arrested, was " 'not carrying a weapon similar to the one described by' the two victims." *Mills,* 278 Md. at 276, 363 A.2d at 499. We quoted favorably the following passage from *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir.1970), a prosecution for theft from the mails:

" '[T]his court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.' "

*Mills,* 278 Md. at 277, 363 A.2d at 499. We concluded that "Mills' home was a probable place for secreting objects such as a hunting knife and a sheath." *Id.* at 280, 363 A.2d at 501.

In *Malcolm v. State,* 314 Md. 221, 550 A.2d 670 (1988), we parenthetically described *Mills* as "upholding warrant based on police allegation of a crime, knowledge of the suspect's address, detailed description of the weapon and *absence of weapon on suspect at time of arrest." Id.* at 233, 550 A.2d at 676 (emphasis added). There is no substantial difference between there being no hunting knife on Mills's person when he was arrested and there being no handgun on Ward when he was brought to police headquarters for questioning one day before the warrant was issued.

A considerable body of authority supports the position taken by this Court in *Mills.* In each of the cases reviewed or cited

below, there was probable cause to believe that a crime of violence, involving the use of a weapon, had been committed, that the defendant was the criminal agent, and that the defendant resided at the place to be searched. Thus, we shall focus on the various courts' rationales as to nexus, to the extent that it might be articulated, between the object to be seized and the defendant's residence.

The *Mills* opinion cited a number of earlier cases that sustained warrants, without any express evidence of nexus, where the affidavit contained the factors that we set forth above. These opinions seem to have considered the facts relating to the elements listed above sufficient to satisfy the nexus requirement. *See Commonwealth v. Butler*, 448 Pa. 128, 291 A.2d 89 (1972); *Riddle v. State*, 257 Ind. 501, 275 N.E.2d 788 (1971); *People v. Alvarado*, 255 Cal.App.2d 285, 62 Cal.Rptr. 891 (1967).

*Mills* and *Lucarz* were cited with approval in *State v. Couture*, 194 Conn. 530, 482 A.2d 300 (1984), *cert. denied*, 469 U.S. 1192, 105 S.Ct. 967, 83 L.Ed.2d 971 (1985). There the police sought the weapon used in a triple murder. The court relied in part on 1 W.R. LaFave, *Search & Seizure* § 3.7, at 709 (1978). " 'Where the object of the search is a weapon used in the crime ... the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police.' " *Couture*, 482 A.2d at 309 (ellipsis in original).[3] In the case now before us Stewart would obviously be unable to identify Ward.

*Mills* was also cited with approval in *Commonwealth v. Cinelli*, 389 Mass. 197, 449 N.E.2d 1207, *cert. denied*, 464 U.S. 860, 104 S.Ct. 186, 78 L.Ed.2d 165 (1983). The court found "compelling" the inference "that the ammunition, which could not be traced to the robbery and which could be used in a future robbery, was at Cinelli's residence." 449 N.E.2d at

---

**3.** The same position, in identical language, is taken in W.R. LaFave, *Search & Seizure* § 3.7(d), at 384 (3d ed.1996).

1216. In the instant matter the warrant included ammunition, and ammunition was found in Ward's car.

*Mills* applied the reasoning of *Lucarz*, 430 F.2d 1051, a case involving the search for the fruits of theft, to the search for a knife. Other courts have similarly relied upon *Lucarz* as support for the search of a residence for evidence other than fruits of the crime. *See United States v. Pheaster*, 544 F.2d 353, 372–73 (9th Cir.1976) (search for articles evidencing kidnapping and extortion), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *State v. Kalai*, 56 Haw. 366, 537 P.2d 8, 12–13 (1975) (reasonable to infer that shotgun used in murder would be found at defendant's residence). *See also State v. Poree*, 406 So.2d 546, 547–48 (La.1981) ("The items sought—a handgun, clothing, money, and a money bag—are objects which one might expect to find at a person's residence."); *Bollinger v. State*, 556 P.2d 1035, 1039 (Okla.Crim. App.1976) ("[A]t the least, a probability existed that the property sought [that included a revolver used in an assault with intent to kill] was indeed at the residence of the defendant.").

In *United States v. Jones*, 994 F.2d 1051 (3d Cir.1993), a robbery prosecution, the court reversed a trial court's ruling suppressing evidence for lack of nexus. The Third Circuit said that the firearms used in the robbery are a type of evidence "likely to be kept in a suspect's residence." *Id.* at 1056. Nevertheless, because of two additional facts, the court concluded that it did not "have to decide whether in every case the fact that a suspect committed a crime involving cash and/or a gun automatically provides a magistrate with enough information to approve a search of a suspect's home." *Id.*[4]

*United States v. Steeves*, 525 F.2d 33 (8th Cir.1975), concerned a prosecution for possession of rifles by a convicted

---

4. The additional information was that an informant told the police that a cellular telephone taken in the robbery was at the suspect's residence. Also, because new motorcycles were parked in front of the residence, the court inferred that the defendants "were not too careful about hiding the loot away from their homes." *Jones*, 994 F.2d at 1057.

felon. That evidence had been observed while FBI agents were executing a search warrant issued in the investigation of a bank robbery in which a handgun had been used. The robbery had occurred on June 22, but the warrant was not obtained until September 17. Although the court recognized that there was "little reason to believe that any of the bank's money ... would still be in the home," the same could not be said of the revolver. *Id.* at 38. The court said that "apart from [the defendant's] prior felony record possession of the pistol was not unlawful in itself or particularly incriminating. Moreover, people who own pistols generally keep them at home or on their persons." *Id. Steeves* was relied upon in *State v. Gathercole,* 553 N.W.2d 569 (Iowa 1996), a robbery prosecution, for the proposition that "it is reasonable to believe that guns will be kept on the subject's person or in his residence." *Id.* at 574.

*Bastida v. Henderson,* 487 F.2d 860 (5th Cir.1973), reversed the issuance of a writ of habeas corpus by a federal district court sought by a Louisiana prisoner who had been convicted of a street robbery in which an automatic pistol had been used. The weapon was seen by an informant on April 8, 1972, in the possession of the prisoner, but the warrant had not been applied for until April 17. *Id.* at 861–62. The Supreme Court of Louisiana sustained Bastida's conviction, stating simply that "there was a reasonable inference from the affidavit, and probable cause to issue the warrant to search defendant's house for automatic weapons used in the robbery." *State v. Bastida,* 271 So.2d 854, 856 (La.1973). The federal district court concluded that there was probable cause as of April 8 but that the information had become stale. *Bastida v. Henderson,* 487 F.2d at 863. The Fifth Circuit held that, after the informant had seen the weapons, "[a] very likely place to find them ... would either be on the persons of the assailants or about the premises where they lived." *Id.*

*Blount v. State,* 511 A.2d 1030 (Del.1986), concerned a murder prosecution in which the handgun used to kill the victim was seized from the defendant's residence under a

search warrant. The appellate court sustained the search by applying the following reasoning:

" 'Concrete firsthand evidence that the items sought are in the place to be searched is not always required in a search warrant.... The question is whether one would normally expect to find those items at that place.... If so, then that inference will suffice to allow the valid issuance of a search warrant for that place.... We think it clear that [the defendant's] residence would be a logical place to search for the weapon and clothing used in the crime.' "

*Id.* at 1033 (quoting *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980) (ellipses in original)). The court also said that "a reasonable magistrate could have concluded that the proximity of the defendant's residence to the crime scene could have rendered immediate disposition of the weapon more imprudent than retaining it." *Id.* The opinion of the Delaware court does not reflect the distance between the murder site, in a park, and the defendant's residence.

In *Minor v. State*, 334 Md. 707, 641 A.2d 214 (1994), we took judicial notice of certain facts of geography that appeared on standard street maps of the community involved. *Id.* at 718, 641 A.2d at 219. Standard Baltimore City street maps reflect that Darley Avenue, where Ward resided at No. 1634, is parallel to, and one block away from, Cliftview Avenue, on which the murder occurred in the 1400 block. Under the rationale of the Delaware court in *Blount,* the warrant-issuing judge in the case before us could have concluded that the weapon had not been disposed of.

The search for evidence, including the gun used in a murder and robbery, was sustained in *McClain v. State*, 267 Ga. 378, 477 S.E.2d 814 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2485, 138 L.Ed.2d 993 (1997), primarily on the basis that it was reasonable to infer that the defendant returned to his residence after the shooting. 477 S.E.2d at 825.

In *Commonwealth v. Cefalo,* 381 Mass. 319, 409 N.E.2d 719 (1980), *rev'd on other grounds, Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the police

searched for the murder weapon and bloody clothing at the defendant's hotel room. The connection was that the victim had been shot in the head, thus permitting a search for bloodstained clothing. 409 N.E.2d at 727. *Davis v. State,* 660 So.2d 1228 (Miss.1995), *cert. denied,* 517 U.S. 1192, 116 S.Ct. 1684, 134 L.Ed.2d 785 (1996), was the appeal from a death sentence for murder committed in the course of a robbery. On the nexus issue the court said: "Cash is the type of loot that criminals seek to hide in secure places like their homes. Similarly, the other items sought, clothing and guns, are also the types of evidence likely to be kept in a suspect's residence." *Id.* at 1239 (citations omitted).

We also note the upholding of the search in *United States v. Sleet,* 54 F.3d 303 (7th Cir.1995). As probable cause for believing that the defendant had robbed the subject bank, the court relied on information that the defendant had been arrested and charged with robbing another bank, and in both instances the robber had vaulted the counter. Further, the defendant was an African–American male in his mid–20s, approximately five feet six inches tall and weighing 140 pounds, a description that also applied to the robber in the crime under investigation. The nexus evidence was that the robber, upon leaving the bank, ran in the direction of an apartment complex, one-half mile away, where the defendant occupied one of the apartments.

There are, of course, cases which do not agree with the approach of the decisions reviewed above. Illustrative is *United States v. Charest,* 602 F.2d 1015 (1st Cir.1979). The appeal was from a conviction for possession of a firearm by one previously convicted of a felony. The gun had been obtained in a search of the defendant's residence in the course of a murder investigation. The First Circuit reversed the conviction for the reasons set forth below.

"Common sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone. If defendant shot Raimondi, as the affidavit states, one of the first things he would do would be to get rid of the gun. The handgun could easily have been disposed of permanent-

ly within a short time after the crime. It is not reasonable to infer that defendant drove from Somerset to Fall River and then casually placed a weapon which had fired more than one bullet into a man on the shelf in his bedroom closet. Ballistics is not only an accurate science, it is also well-known. We have been unable to find any case in which a search warrant was issued for a person's home on the sole basis that a handgun had been used by that person in the commission of the type of crime where the bullets used could be traced to the gun."

*Id.* at 1017 (footnotes omitted).

In 1985 the above case was distinguished by the Supreme Court of New Hampshire on the basis that Charest "was suspected of shooting a known acquaintance in the presence of three witnesses, and he would therefore have expected the police to try to connect him with a gun." *State v. Faragi,* 127 N.H. 1, 498 A.2d 723, 727 (1985) (opinion by Souter, J.).

The conflict between the *Charest* approach and that of the other cases reviewed above was squarely addressed by the United States Court of Appeals for the Fourth Circuit in *United States v. Anderson,* 851 F.2d 727 (4th Cir.1988), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989). Virginia police had found an unregistered silencer for a .45 caliber handgun in the search under a warrant of the defendant's residence during the course of a murder investigation. The Fourth Circuit, speaking through Judge Murnaghan for a panel that included Judge Frank A. Kaufman of the District of Maryland, declined to decide the case on the basis of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The court found the holdings in cases including *Bastida v. Henderson* and *United States v. Steeves,* both *supra,* "to be more persuasive" than *Charest* and the somewhat similar holding in *United States v. Lockett,* 674 F.2d 843 (11th Cir. 1982). *Anderson,* 851 F.2d at 729. The Fourth Circuit concluded:

"It was reasonable for the magistrate to believe that the defendant's gun and the silencer would be found in his

residence. Therefore, *even though the affidavit contains no facts that the weapons were located in defendant's trailer,* we reject his argument that the warrant was defective." *Id.* (emphasis added).

### III. The Car

■ The same probable cause that supported issuance of the search warrant for 1634 Darley Avenue supported a search warrant for Ward's nine-year-old Oldsmobile. The handgun and the ammunition for which the police were searching were highly portable and could be under the defendant's control either at his home or concealed in his automobile. LaFave states: "It is permissible to have a single warrant authorize search of a described place and a described person or of a described place and a described automobile, without regard to whether the person or vehicle is to be found at the place described." W.R. LaFave, *Search & Seizure* § 4.5(c), at 535 (3d ed.1996).

*People v. Easley,* 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813 (1983), *aff'd on reh'g,* 46 Cal.3d 712, 250 Cal.Rptr. 855, 759 P.2d 490 (1988), is on point. In that double-murder capital punishment case the victims had been bound with baling wire and then stabbed with an icepick. A warrant was issued to search for evidence of the crime at four places, the defendant's residence before the crime, his residence after the crime, the car which he owned before the crime and retained thereafter, and the additional car that he bought after the crime. The court rejected the defendant's argument that "the authorization to search four different places demonstrates that the affiant did not know where the sought-after property actually was located." 196 Cal.Rptr. 309, 671 P.2d at 820. Rather, the court said "[t]here is no logical inconsistency in the conclusion that an affidavit establishes probable cause to believe that evidence of a crime will be in any one of a suspect's homes or vehicles." *Id.*

Particularly noteworthy is the content of the affidavit in *Easley.* As summarized by the court, the pertinent information in the affidavit was as follows:

"A search warrant designating more than one person or place to be searched must contain sufficient probable cause to justify its issuance as to each person or place named therein. The affidavit in question established that defendant had obtained baling wire one day before the killings; that he was in Modesto on the day of the murders; that his fingerprint had been found on a piece of paper which was lying next to one of the victims; and that he had purchased a car and rented an apartment, paying large sums of money in cash, within four days after the homicides. On the basis of this information, the magistrate properly concluded that there was probable cause to believe that evidence of the crime could be found at either of defendant's residences or in either of his cars."

*Id.* (citations omitted).

Searches of four places under a single warrant were also sustained in *Williams v. State,* 95 Okla.Crim. 131, 240 P.2d 1132 (App.1952). That was a bootlegging case in which the search for intoxicating liquor was authorized at an inn on one side of a major highway, another inn on the other side of that same highway, the residence of the defendant, and the automobile of the defendant. 240 P.2d at 1135. The court was satisfied that the same probable cause applied to all locations inasmuch as they "were being operated by one person, partnership or corporation." *Id.* at 1137.

In another capital sentence case, involving the search for a knife and bloodstained clothing that would evidence a rape, federal courts, on habeas corpus review, sustained the issuance of a warrant to search both the defendant's residence and his automobile. *Vessels v. Estelle,* 376 F.Supp. 1303 (S.D.Tex. 1973), *aff'd without opinion,* 494 F.2d 1295 (5th Cir.1974), *cert. denied,* 419 U.S. 969, 95 S.Ct. 234, 42 L.Ed.2d 185 (1974). The factors that the district court pointed to in the affidavit were "that the assailant's car was seen in the vicinity of the victim's house, ... that the assailant left the house with the knife, and that the assailant's house was a place where implements such as knives would ordinarily be kept." *Id.* at 1309. In a supplemental opinion on reconsideration the district court

would not modify its search and seizure analysis, commenting that "the knife and the clothes which were the subject of the search are likely to remain as continuing articles." *Id.* at 1311.

Warrants were issued simultaneously to search two automobiles in *Porter v. United States,* 335 F.2d 602 (9th Cir.1964), *cert. denied,* 379 U.S. 983, 85 S.Ct. 695, 13 L.Ed.2d 574 (1965). From one of the vehicles, an Oldsmobile, the FBI had seized a sawed-off shotgun, the possession of which formed the basis for the prosecution in the cited case. The search warrants had been issued in the investigation of a bank robbery after the victim teller had identified Porter as the robber. The warrants sought specifically described items of clothing and a handgun. *Id.* at 604. The Oldsmobile to be searched was registered in another state under an assumed name. At the same time that the FBI applied for the warrant to search the Oldsmobile, the investigators applied for a warrant to search a Rambler also registered in another state, but in the name of Porter's purported wife. Porter argued "that the application for this second warrant is an indication that the search of each of the automobiles would be an exploratory search, comparable to a ... 'general warrant'...." *Id.* at 605. In response to this argument the court said:

> "A warrant to search for three named and described articles, a gun, a cap and a coat is in no sense a general warrant. As to the significance of the fact that two warrants were issued, one for the Oldsmobile and the other for the Rambler, surely the fact that a suspect has two automobiles, or two residences, does not mean that neither one of them can be searched, because the suspect may have concealed the wanted evidence in the other one."

*Id.*

There are other cases where warrants have been issued for both the residence and the automobile of the defendant, where the affidavit has indicated that the vehicle may have been used in leaving the scene of the crime, but this latter factor is not said to be the threshold of validity. *See, e.g., United States v.*

*Morris,* 647 F.2d 568 (5th Cir.1981) (robbery); *State v. Higginbotham,* 162 Wis.2d 978, 471 N.W.2d 24 (1991) (arson); *State v. Iverson,* 187 N.W.2d 1 (N.D.) (murder), *cert. denied,* 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971).

In the case before us we are informed by the affidavit that Ward was operating his car within forty-eight hours after the murder. Obviously, Ward was not hiding out at home. Inasmuch as his handgun could be considered an item of continuing utility and value to him, the warrant-issuing judge reasonably could have inferred that Ward might be moving the gun and ammunition between his residence and his vehicle, so that there was probable cause to believe that evidence of the crime could be found in Ward's vehicle.

## IV. Preference to Warrants

The instant matter is not a clear cut case and, obviously, it would have been much more helpful had the affidavit contained more detail. The issue of the validity of this search has been examined since 1992 in two separate cases, at three levels of court, with the result that seven judges have concluded that there was probable cause and six judges have concluded that there was not. Seemingly the instant matter is a classic illustration of the "doubtful or marginal cases" referred to by the Supreme Court in *United States v. Ventresca,* the resolution of which "should be largely determined by the preference to be accorded to warrants." 380 U.S. at 109, 85 S.Ct. at 746, 13 L.Ed.2d at 689. *See also Mills v. State,* 278 Md. at 280, 363 A.2d at 501.

For all the foregoing reasons the search warrant in the instant case was valid.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE

COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, GARY R. WARD.

BELL, C.J., and ELDRIDGE and WILNER, JJ., dissent.

BELL, Chief Judge, dissenting.

The majority today holds that the issuance of search warrants to search a person's home is valid when "there [is] probable cause to believe that a crime of violence, involving the use of a weapon, had been committed, that the defendant was the criminal agent, and that the defendant resided at the place to be searched." *State v. Ward,* 350 Md. 380, 712 A.2d 537 (1997). Applying this standard to the instant case, it concludes that the judge who issued the warrant properly found probable cause to search the residence of, and the car belonging to, Gary R. Ward ("Ward" or the "respondent") even though the affidavit accompanying the warrant application contained no facts from which the issuing judge could reasonably have inferred that the instrumentality of the crime could be found in either place.

This holding, I believe, significantly undermines the fundamental purpose of the constitutional protections afforded by the Fourth Amendment, as it abrogates the requirement that, prior to issuance of a search warrant, the affiant establish a reasonable nexus between the items sought by the warrant and the premises or places to be searched. Moreover, it essentially creates a "standardless" test for probable cause. The natural and certain consequence of this decision is that probable cause automatically will exist sufficient for the issuance of a search warrant for both the residence and vehicle of a suspect in a criminal investigation, whenever the instrumentality of the crime or key evidence relating to it is not found on that suspect when he or she is questioned or arrested.[1] I dissent.

---

1. In *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, *rehearing denied,* 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969), the United States Supreme Court held that a search incident to an arrest may be conducted of those areas within the immediate control of the

(i)

In the instant case, the State asserts that there was substantial basis for the judge who issued the warrant to find that there was probable cause to believe that evidence of a murder would be found in the respondent's residence or car. It argues that:

"[T]he search warrant affidavit in this case contained undisputed probable cause that Respondent Ward had murdered a man five days earlier by firing multiple shots into the victim's body. The affidavit also set forth that Ward had previously been arrested for violating the handgun laws, and that his address and car were known to police. Based on this information, the judge relied on normal and reasonable inferences to conclude that the murder weapon and other evidence of the crime were probably in either Ward's home or his car, and issued a warrant to search both places."

The affidavit to which the State referred and which was a part of the search warrant application [2] contains a complete recitation of the facts as follows:

"On September 1992, at 2325 [hours], P/O Bruce Ridley of the Eastern District responded to the 1400 Blk Cliftview Ave for a shooting. Upon his arrival he observed the victim later identified as Alfred Stewart, lying in the street between two (2) parked cars, suffering from multiple GSW's

---

person arrested. That holding may be significantly extended and expanded by the majority's opinion in this case. Now, a search incident to arrest that fails to recover the instrumentality or evidence of the crime provides probable cause for the search of not simply the suspect's residence but also the suspect's car.

**2.** The Application For Search and Seizure Warrant is composed of four pages, three of which contain the affidavit. The first page of the affidavit, which is not reproduced here, provides a brief description of the affiant's years of service as a police officer. The remaining pages are the actual warrant application. It states that 1634 Darley Avenue is a "two (2) story brick row house," that the alleged crimes committed by the respondent included first degree murder and a felony handgun violation, and that the properties to be seized include "Handguns, Ammunition, Personal papers showing ownership/possession of a firearm," and "Any and all evidence relating to the crime of Murder."

[t]o the body. BFD Medic # 3 responded to the scene and pronounced the victim dead at 2337 [hours]. At 2351 [hours] your affiant arrived on the scene and took charge of the investigation. Several anonymous telephone calls were received in the Homicide office on 1–2 October 1992 in reference to the recent homicide[.][A]ll the calls indicated that a Gary Ward B/M/20–21 yrs of the 1600 Blk of Darley was responsible for the death of the victim. Gary Ricardo Ward has an arrest record with the Baltimore City Police Department under [B of I] # 374–587 to include handgun [v]iolations[.] On 2 October 1992 at approx[imately] 2030 [hours.] Gary Ward was brought into the Homicide office and his 1983 Olds Cutlass, black in color[,] was towed into the headquarters building. Mr. Ward was interviewed but was released due to the lack of any eyewitnesses. Ward's vehicle was kept at the Police building due to expired [t]ags. On 3 October 1992 a witness was developed who picked out the photograph of B of I # 374–587 and positively identified the suspect as the person responsible for the death of the victim on 30 September 1992.

"The suspect Gary Ward gave the address of 1634 Darley Ave as his home address. The vehicle[,] a 1982 Old Cutlass Maryland [t]ag [# ] ZWH075[,] is listed to Mr. Ward at 1634 Darley Ave. address. Your affiant prays that a search warrant be issued for the above listed location and vehicle. Your affiant believes that probable cause exists to believe that there is evidence relating to the crime of Murder being stored at 1634 Darley Ave and the 1983 OLDS Cutlass Maryland Tag # ZWH–075. Therefore, your affiant prays that a search and seizure warrant be issued for the said premises and vehicle."

It is absolutely clear to me that nothing in this affidavit, nor the reasonable inferences that may be drawn from the allegations in it, provides a substantial basis, much less probable cause, for believing that evidence relating to the murder could be found in the respondent's residence or car.

The majority holds otherwise. It does so with a string of "inferences" that, in fact, are no more than bald assumptions,

and by making independent factual determinations that go well beyond the affidavit. Specifically, the majority opines:

"Stewart was shot on the evening of September 30, 1992, in the 1400 block of Cliftview Avenue in the Eastern District of Baltimore City Police Department. Inasmuch as the cause of death was multiple gunshot wounds and his body was found lying between two parked cars, the inference is that Stewart was gunned down on the public street. The warrant authorized a search for, *inter alia,* 'Handguns, Ammunition, Personal Papers showing ownership/possession of a firearm.' It is self-evident that the murder weapon was not found at the crime scene.

"The fact that the first of the witnesses who telephoned the police would not identify themselves is significant. These witnesses knew Ward by sight and name. There was no information from any caller that the murderer was a person other than Ward. Ward, age twenty-twenty-one, had an arrest record that included two or more handgun "[v]iolations." All of this information permitted the magistrate to infer that these witnesses were unwilling to identify themselves because they feared Ward. The affidavits described Ward, not in terms but in reasonable inference, as a person to whom a handgun and ammunition are items of utility and value. Consequently, the magistrate could infer a reasonable probability that, between the murder and application for the warrant, Ward had not disposed of the murder weapon and that Ward would be even less likely to have disposed of the weapon's less incriminating bullets.[3]

---

**3.** The majority believes that, because the respondent had two or more handgun violations and the witnesses feared him, it is reasonable to surmise that the respondent found value in, and use for, handguns and, consequently, would not have disposed of the murder weapon or "the weapon's less incriminating bullets." There simply is no basis for this "inference," which notwithstanding what happened in this case, may even defy commonsense. It is, of course, well settled that whether probable cause exists is determined pre-search and cannot be justified on the basis of the result of the search. *See Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, *rehearing denied,* 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970); *Zurcher v. The Stanford*

"The magistrate further could infer that the weapon was not on Ward's person when he was brought in for questioning less than forty-eight hours after the murder. As a matter of self-protection the police most certainly would have done a pat-down for weapons when they accosted Ward, and the police were still looking for the murder weapon when they applied for the warrant. Apparently Ward was accosted when he was in or about his automobile, inasmuch as the police towed that automobile to headquarters while Ward was transported to headquarters by other means. Thus, the weapon was not in plain view in Ward's automobile when the police towed it."

*Ward,* 350 Md. at 376, 377, 712 A.2d at 536.

By use of these "inferences," the majority is satisfied that the judge was enabled to determine that a sufficient nexus between the murder weapon and Ward's residence and car had been established and that there was probable cause for issuance of the search warrant; "the magistrate had probable cause to believe the murder weapon and associated evidence of the crime of murdering Stewart could be found in Ward's home and/or in his automobile, but out of view." *Id.* at 377, 378, 712 A.2d at 536. I disagree.

### (ii)

Fear of unreasonable government intrusion is the basis of the constitutional restriction against arbitrary governmental searches. As the Supreme Court observed in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222, *rehearing denied,* 494 U.S. 1092, 110 S.Ct. 1839, 108 L.Ed.2d 968 (1990),

"The driving force behind the adoption of the Fourth Amendment, as suggested by Madison's advocacy, was widespread hostility among the former colonists to the issuance

---

*Daily,* 436 U.S. 547, 558, 98 S.Ct. 1970, 1977–78, 56 L.Ed.2d 525, *rehearing denied,* 439 U.S. 885, 99 S.Ct. 231, 58 L.Ed.2d 200 (1978); *Henderson v. State,* 243 Md. 342, 347, 221 A.2d 76, 79 (1966); *Waugh v. State,* 275 Md. 22, 30, 338 A.2d 268, 272–73 (1975).

of writs of assistance empowering revenue officers to search suspected places for smuggled goods, and general search warrants permitting the search of private houses, often to uncover papers that might be used to convict persons of libel. . . . The available historical data show, therefore, that the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government."

*Id.* at 266, 110 S.Ct. at 1061, 108 L.Ed.2d at 233. Reflecting this initial purpose, the text of the Fourth Amendment, which either has been overlooked or forgotten by the majority, provides:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

U.S. Const. amend IV. *See United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972)("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). *See also Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961)(Fourth Amendment applicable to states), *rehearing denied,* 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961). Thus, no search warrant can be issued without a fair and proper determination of probable cause.

In its purest form, probable cause is simply "a fair probability that contraband or evidence of a crime will be found in particular place." *Malcolm v. State,* 314 Md. 221, 222, 550 A.2d 670, 673 (1988)(quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)). It is "a nontechnical conception of a reasonable ground for belief" that the items sought will be found in the premises searched. *Edwardsen v. State,* 243 Md. 131, 136, 220 A.2d 547, 551 (1966); *see also Brinegar v. United States,* 338 U.S. 160, 176,

69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1891, *rehearing denied,* 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949). Probable cause requires "less evidence for such belief that would justify conviction but more evidence than that which would arouse a mere suspicion." *Id.; Collins v. State,* 322 Md. 675, 681, 589 A.2d 479, 482 (1991). Correspondingly, the Supreme Court explained in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, *rehearing denied,* 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983):

> "Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.' *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302,[1311,] 93 L.Ed. 1879 [,1891] (1949). 'In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.' "

*Id.* at 231, 103 S.Ct at 2328, 76 L.Ed.2d at 544. Thus, probable cause does not equate to speculation, suspicion, a hunch, or a gut-feeling; rather, it is a test of reasonable probabilities based upon the specific facts and information set forth in the warrant. As one scholar remarked, "[i]f there is one bright star in the Fourth Amendment heaven, it is that probable cause must be shown on the basis of facts rather than mere conclusions." W.R. LaFave, 2 Search and Seizure § 3.2.(d), at 57 (1996 ed.). Also, and more important, "the critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is a reasonable cause to believe that specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. The Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 1976–77, 56 L.Ed.2d 525, 535–36 (1978); *see also Commonwealth v. Kline,* 234 Pa.Super. 12, 16, 335 A.2d 361, 364 (Pa.Super.1975); LaFave, § 3.1(b), at 10.

A judge issuing search warrants has a clear and certain duty:

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548. The judge, thus, must have reasonable grounds to believe that the items are at the premises to be searched. In other words, a judge issuing a search warrant must make a determination that there is a reasonable probability or likelihood, based upon facts and/or the reasonable inferences drawn from those facts, that the items to be seized are on the premises to be searched. Moreover, the issuing judge must make the probable cause determination on his or her own, using his or her independent judgment; he or she cannot "mere[ly] ratif[y] the bare conclusions of others." *Id.* at 239, 103 S.Ct. at 2333, 76 L.Ed.2d at 549. A mere possibility, not to mention one that is far-fetched and based on nothing more than assumption or speculation, will not suffice. *See State v. Lee,* 330 Md. 320, 326, 624 A.2d 492, (1993); *Valdez v. State,* 300 Md. 160, 168, 476 A.2d 1162, 1166 (1984)( a magistrate's determination of probable cause is confined to the four corners of the warrant.) *See also Grimm v. State,* 7 Md.App. 491, 493, 256 A.2d 333, 334 (1969)("It is ... well settled that the presence or absence of probable cause to support the search warrant must be determined from the allegations of the application for the warrant.") (citing *Tucker v. State,* 244 Md. 488, 496, 224 A.2d 111, 115 (1966), *cert. denied,* 386 U.S. 1024, 87 S.Ct. 1381, 18 L.Ed.2d 463 (1967); *Henderson v. State,* 243 Md. 342, 344, 221 A.2d 76, 77 (1966); *Burrell v. State,* 207 Md. 278, 279, 113 A.2d 884, 884–85 (1955)). Chief Judge Robert C. Murphy, later Chief Judge of this Court, writing for the *Grimm* court, observed further that "the court's determination of the existence of probable cause must be confined solely to the affidavit itself, and evidence outside the affidavit, no matter by whom produced or how, is not relevant to the inquiry of probable cause." *Id.*

(citing *Smith v. State,* 191 Md. 329, 335, 62 A.2d 287, 289 (1948), *cert. denied,* 336 U.S. 925, 69 S.Ct. 656, 93 L.Ed. 1087 (1949)).

Unlike the duty of the issuing judge, "the duty of the reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing] that probable cause existed.' " *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332, 76 L.Ed.2d at 548; *see also Birchead v. State,* 317 Md. 691, 700– 01, 566 A.2d 488, 492–93 (1989). "[T]he task of a reviewing court is not to conduct a *de novo* review of the magistrate's determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 2085, 80 L.Ed.2d 721, 724 (1984); *see also Potts v. State,* 300 Md. 567, 572, 479 A.2d 1335, 1338 (1984); *Birchead,* 317 Md. at 701, 566 A.2d at 493. A substantial basis standard of review [4] accords the magistrate

---

4. "Substantial basis" means different things to different courts. For example, the Seventh Circuit has equated the "substantial basis" standard and the "clearly erroneous" standard. *See United States v. Spears,* 965 F.2d 262, 270 (7th Cir.), *cert. denied,* 506 U.S. 989, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992); *United States v. Sleet,* 54 F.3d 303, 306 (7th Cir.1995). Yet, in the Fourth Circuit, "[t]he sufficiency of a search warrant and its supporting affidavit is reviewed *de novo* to determine whether a 'substantial basis exists for the magistrate judge's decision.' " *United States v. Oloyede,* 982 F.2d 133, 138 (4th Cir.1992). But see *State v. Amerman,* 84 Md.App. 461, 472, 581 A.2d 19, 24 (1990), where the Court of Special Appeals observed that the " 'substantial basis' standard is less demanding than even the familiar 'clearly erroneous' standard by which appellate courts review judicial facts finding in a trial setting." At least one state court has interpreted "substantial basis" as an abuse of discretion standard. *See Badoino v. State,* 785 P.2d 39, 41 (Alaska App.1990).

The substantial basis standard "is more deferential than de novo review (the standard for review of probable cause in nonwarrant cases), [but] it is 'less deferential than clearly erroneous review' (the standard of review used in other areas of law to review the application of a legal standard to a particular set of facts)." LaFave, at § 3.1 (footnote omitted). *But see generally Jones v. State,* 343 Md. 448, 457, 682 A.2d 248, 253 (1996)("When the question is whether a constitutional right, such as, as here, a defendant's right to be free from unreasonable searches and seizures, has been violated, the reviewing court makes it

a measure of deference. That deference is not without limits, however. The reviewing court has the responsibility of ensuring that the magistrate did not merely serve as a "rubber stamp for the police" and issue the search warrant based upon "bare bone" affidavits, or affidavits containing only wholly conclusory statements. *Gates*, 462 U.S. at 239, 103 S.Ct. at 2333, 76 L.Ed.2d at 549. *See Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964). The Supreme Court reaffirmed this teaching in *United States v. Leon*, 468 U.S. 897, 915, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677, *rehearing denied*, 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984):

> "[R]eviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.' *Illinois v. Gates*, 462 U.S. at 239, 103 S.Ct. at 2332, [ 76 L.Ed.2d at 549] 'Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.' *Ibid. See Aguilar v. Texas, supra* 378 U.S. at 114–115, 84 S.Ct. at 1513–1514 [12 L.Ed.2d at 723]; *Giordenello v. United States*, 357 U.S. 480, 485–86, 78 S.Ct. 1245, 1249-50, 2 L.Ed.2d 1503, 1509 (1958); *Nathanson v. United States*, 290 U.S. 41, 46, 54 S.Ct. 11, 13, 78 L.Ed. 159 (1933). Even if the warrant application was supported by more than a 'bare bones' affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, *Illinois v. Gates, supra*, 462 U.S. at 238–239, 103 S.Ct. at 2332–2333 [, 76 L.Ed.2d at 548], or because the form of the warrant was improper in some respect."

*Id.* at 915, 104 S.Ct. at 3416–17, 82 L.Ed.2d at 693–94 (footnote omitted). *See also Gates*, 462 U.S. at 239, 103 S.Ct. at 2332, 76 L.Ed.2d. at 548–49("In order to ensure that such an

---

own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case.").

abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of the affidavit on which warrants are issued.").

An issuing judge's erroneous probable cause determination may reflect either an improper analysis of the nexus requirement—that the facts set forth in the affidavit establish a link between the criminal activity, the evidence sought, and the place to be searched, *see Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548,—or a failure to appreciate that such a requirement exists. Again, the court in *United States v. Lalor,* 996 F.2d 1578, 1582 (4th Cir.), *cert. denied,* 510 U.S. 983, 114 S.Ct. 485, 126 L.Ed.2d 436 (1993), like the Supreme Court in *Zurcher,* 436 U.S. at 556, 98 S.Ct. at 1976–77, 56 L.Ed.2d at 535–36, recognized that "[i]n determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." That court also pointed out that the search of a defendant's home can be "upheld only where some information links the criminal activity to the defendant's residence." *Id.* at 1583. One oft-quoted scholar of search and seizure law has further explicated this point:

"The more complicated probable cause determination which must be made in search cases may be said to include four ingredients: time; crime; objects; and place. The time factor, whether the time of critical events has been sufficiently determined, and if so, whether the information is thus neither too 'stale' not too 'fresh'. . . . Assuming no problem exists with respect to time, it is still necessary that there be established a sufficient nexus between (1) criminal activity, and (2) the things to be seized, and (3) the place to be searched.

"For one thing, even if the connection between things and place is clear beyond question, it may still be possible that probable cause is lacking. This is because even if there is probable cause—or even absolute certainty—that certain described items are presently to be found in a certain

described place, a lawful basis for the search has not been established unless it is also shown to be probable that those items constitute the fruits, instrumentalities, or evidence of crime.

"A second type of situation is that in which it is clear that certain identifiable items are connected with criminal activity, but the difficult question is whether it is probable that those items are to be found at the place to be searched—the place typically being the residence of the person reasonably believed to have committed the offense.

"When there is direct information connecting the items with the place, as where it is known that the criminal activity actually occurred at that place or adjacent thereto or where it is known that the crime occurred elsewhere but the fruits thereof were recently observed at the place, the objects-place nexus may be clear. Difficult problems can arise, however, when such direct information concerning the location of the objects is not available and it must be determined what reasonable inferences may be entertained concerning the likely location of those items."

Lafave, § 3.7(d), at 372, 375–77. *Accord* Y. Kamisar, W.R. LaFave, J.H. Israel, Modern Criminal Procedure, ch. 5, at 191–92 ( 7th ed.1989).

(iii)

Cognizant of the problems that this case presents from the standpoint of establishing the nexus between the residence and car to be searched and the property sought, the majority avoids them by creating a lower nexus standard. Under that standard, as we have seen, probable cause for the search of a crime suspect's residences and vehicles may be found whenever the instrumentality of the crime or other evidence of the crime is not in the suspect's possession when the suspect is interrogated or arrested. The majority relies heavily on one Maryland case, *Mills v. State*, 278 Md. 262, 363 A.2d 491 (1976), *aff'g*, 28 Md.App. 300, 345 A.2d 127 (1975). In that case, as in this one, this Court held that the fact that a weapon similar to the one described by the victims was not recovered

**402**

when the suspect was arrested provided probable cause to search that suspect's residence. *See Malcolm v. State,* 314 Md. 221, 233, 550 A.2d 670, 676 (1988), in which we included *Mills* in a string citation after the signal "*cf.,*" accompanied by a parenthetical describing it as "upholding warrant based on police allegation of a crime, knowledge of the suspect's address, detailed description of the weapon and absence of weapon on suspect at time of arrest." Even in *Mills,* however, we recognized the proper nexus standard and, indeed, there is even an indication in that case that there was a nexus, although how substantial is not so clear, between the instrumentality of the crime and the defendant's residence.

In *Mills,* the defendant was convicted by a Montgomery County jury of the rape, armed robbery and kidnaping of two women. When Mills was arrested, neither the instrumentality nor evidence of the crimes was found on him. During the interrogation, the police obtained a detailed description of Mills's residence, including his address and the description of a specific room in which the police believed the knife used in the crime, and its sheath, could be found. Based, in part, on that information, the police obtained a search warrant, as a result of which, the knife and sheath were retrieved in the room of the house that was specified in the warrant. At trial, Mills unsuccessfully moved to suppress the items retrieved from his home on the grounds that the search warrant was improper, arguing: " '[t]he only basis for the conclusion that the knife was on the premises [was] the fact that he was not carrying it when he was arrested.' " *Mills,* 278 Md. at 277, 363 A.2d at 498. Mills also argued that his *Miranda*[5] rights were violated, thus, the fruits of the illegal custodial questioning, namely the location of the knife, should be suppressed. The police "explained at the suppression hearing that th[e] inquiry [into Mill's address and the specific part of the house in which he lived] was made because their 'investigation at the time of the arrest revealed there was certain pertinent physi-

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

cal evidence that might be present in [Mill's] home.' " *Id.* at 266, 363 A.2d at 493. Although the opinion of the Court does not discuss any independent basis for its decision, Mills had argued and the Court had acknowledged affirmatively the proper nexus standard.[6] Consequently, the police may actually have had an independent basis for believing that the knife used during the commission of the crimes was in Mill's residence. What is clear is that the police investigator's explanation satisfied this Court that there was the proper nexus. Certainly, the Court cannot be understood as disregarding the proper standard in favor of an arbitrary one. Thus, although, at first glance, it may not have seemed to have done so, *Mills* may actually have applied, albeit incorrectly, in my view, the proper nexus standard; the decision may be read as suggesting that, in addition to the mere absence of the crime weapon when Mills was arrested, the police had a basis for believing that the instrumentality of the crime was in Mills's residence.

The other cases upon which the majority relies are also distinguishable from the case at bar. First, and most important, in those cases, the police presented more facts in their application for search warrants to establish the nexus between the suspect's residence and the crime than the police did here. For example, in *Blount v. State,* 511 A.2d 1030 (Del.Super.1986) a murder case, the affidavit in support of the warrant stated, *inter alia,* that a witness told police that he had seen, on March 14, 1983, a man, the defendant, who fit the murderer's description, at both the Spanish Oak Apartments and at the murder scene, a nearby park. The affidavit also stated that when the police searched the area, they recovered property belonging to the victim on the pathway leading from

---

6. In that regard, this Court opined:

" 'As the search warrant is issued for the basic purpose of making a search, the probable cause necessary to support its issuance requires a proper showing not only that a crime has been or is being committed, but also that the evidence of the crime is upon the person or within the place or thing to be searched' "

*Mills,* 278 Md. at 276–77, 363 A.2d at 498 (quoting *Scott v. State,* 4 Md.App. 482, 488–89, 243 A.2d 609, 613–14 (1968), *cert. denied,* 252 Md. 732 (1969)) (citations omitted).

the park to the Spanish Oak Apartments. When in custody, the defendant told detectives that he lived in the Spanish Oak Apartments, had been in the park around the time the murder had occurred and had, the day of the murder, used the pathway from the park to Spanish Oak Apartments, where the victim's effects were found. There was, in short, far more information in the affidavit in *Blount* from which to infer that the murder weapon would be found in the defendant's home than was presented to put the murder weapon in the respondent's home in the case at bar.

Second, the bulk of the cases cited by the majority are not murder cases, rather they involve robbery, rape, kidnaping, conspiracy to launder money, possession of illegal drugs, or possession of illegal weapons. *See Bastida v. Henderson*, 487 F.2d 860 (5th Cir.1973); *United States v. Ramos*, 923 F.2d 1346 (9th Cir.1991); *United States v. Steeves*, 525 F.2d 33 (8th Cir.1975); *United States v. Jones*, 994 F.2d 1051 (3rd Cir. 1993). *See Mills*, 278 Md. 262, 363 A.2d 491 (1976). This is important because a murder committed with a weapon, and especially a handgun, is inherently different from the crimes committed in the aforementioned cases. When a person commits a robbery, for example, one may legitimately infer that he or she will keep the proceeds; that, after all, is the only point of the endeavor. The same or a similar analysis applies with respect to the other crimes. In a situation such as presented here, that a murderer will keep, in his home or automobile, the very instrumentality of his crime, a gun that can be linked to the crime by means of ballistics testing, is not a strong or reasonable inference. *See United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir.1979)("It is not reasonable to infer that defendant ... casually placed a weapon which had fired more than one bullet into a man on the shelf in his bedroom closet.")(citing *United States v. Flanagan*, 423 F.2d 745, 747 (5th Cir.1970)).

The nexus between the evidence sought and the place to searched was quite a bit stronger in *United States v. Anderson*, 851 F.2d 727 (4th Cir.1988), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989) than in the instant

case. There, the defendant was convicted of unlawful possession of an unregistered silencer for use on a .45 caliber handgun. The police applied for a warrant to search the defendant's home, offering an affidavit stating that three witnesses had been in touch with the defendant, that the defendant had told them he had a gun for sale, and that the gun had been used to kill someone. The magistrate issued the warrant. The Court of Appeals for the Fourth Circuit concluded, *inter alia*, that, "even though the affidavit contained no facts that the weapons were located in the defendant's [home], we reject his argument that the warrant was defective." *Id.* at 729. But see *United States v. Williams*, 974 F.2d 480, 480–481–482 (4th Cir.1992) and *United States v. Lalor*, 996 F.2d 1578, 1583 ( 4th Cir.1993), where the Fourth Circuit observed that "residential searches have been upheld only where some information links the criminal activity to the defendant's place of residence." Looking at the allegations in the affidavit, it is clear that the magistrate had affirmative information that permitted the magistrate reasonably to conclude that the defendant still had the gun (one cannot sell something one does not have), and that conclusion made it reasonable for the magistrate to infer that, if Anderson still had the gun, it likely would be in his home. There is no such evidence in the instant case to support any such inferences.

Indeed, as the majority acknowledges, there is a significant number of cases in which the warrant application and the accompanying affidavit establish more of a nexus than the instant case and, yet, the reviewing court determined that probable cause had not been shown. *See State v. Lee*, 330 Md. 320, 323, 624 A.2d 492, 493 (1993)(no probable cause to search defendant's residence although (1) confidential informant informed police that defendant possessed LSD, and he could purchase LSD from defendant, (2) defendant had been convicted of possession of controlled dangerous substance with intent to distribute, and (3) police received two anonymous reports that the defendant was involved in distribution of LSD); *United States v. Dickerson*, 975 F.2d 1245, 1249–50 (7th Cir.1992)(where only the license registration connected a

car, used in a robbery, to the defendant's home, there is no probable cause to search residence); *United States v. Lockett,* 674 F.2d 843, 846 (11th Cir.1982)(affidavit set forth no facts from which to infer that dynamite was located at that particular place); *United States v. Truong,* 921 F.Supp. 39, 41–42 (D.Mass.1996)(common sense analysis established that search of defendant's residence would recover only travel documents, not evidence of murder).

In *United States v. Lalor,* 996 F.2d 1578 (4th Cir.), *cert.denied,* 510 U.S. 983, 114 S.Ct. 485, 126 L.Ed.2d.436 (1993), the defendant was arrested on cocaine possession and firearm charges following the execution of a search warrant at his residence. The affidavit attempted to establish a nexus between the drug activity and the residence as follows: (1) two informants said that the defendant, known as "Jamaican John," was selling cocaine on Northern Parkway and Loch Raven Boulevard; (2) the defendant sold cocaine by using a personal pager to receive messages and then meet the buyer on East Northern Parkway; (3) one informant believed that Jamaican John lived on Waverly Way and drove a blue Dodge Daytona with Maryland State tag reading "Thumpur;" and (4) a second informant confirmed that John lived with his girlfriend in the Loch Raven Apartment on Waverly Way.

The police's independent investigation substantiated the informants' statements. The affidavit recited that: on two separate occasions, the affiant police officer saw a blue Dodge Daytona with the tag "Thumpur" parked in the 1600 block of Waverly Way; another police officer told the affiant that she had stopped a blue Doge Daytona with the "Thumpur" tag and the driver identified himself as "John Lalor of 1572 Waverly Way;" although 1572 Waverly Ways was rented to a woman, whose boyfriend, "Jerry Jones," was listed as an apartment resident, Jones's date of birth was the same as Lalor's; Lalor's arrest record revealed that he had been arrested, at least two times for handgun and cocaine possession, once just several days before the execution of the search warrant. Based on this information, the police obtained a search war-

rant for 1572 Waverly Way for "cocaine, narcotic paraphernalia, U.S. currency, related objects and personal papers."

Lalor argued that there was no nexus connecting the drug activity to 1572 Waverly Way. The Fourth Circuit agreed, stating:

"The court finds the affidavit is devoid of any basis from which the magistrate could infer that evidence of drug activity would be found at 1572 Waverly Way. The affidavit does not describe circumstances that indicate such evidence was likely to be stored at Lalor's residence.... Nor does the affidavit explain the geographic relationship between the area where the drug sales occurred and 1562 Waverly Way. Although the magistrate might have been able to draw an inference from the proximity of the drug sales to Lalor's residence, the record contains no evidence concerning this distance. The magistrate was given no basis for making a judgment concerning this aspect of probable cause."

*Lalor*, 996 F.2d at 1582–83(citations omitted); *see also id.* at 1583(citing *United States v. Ramos*, 923 F.2d 1346, 1352 (9th Cir.1991))(finding no probable cause where surveillance did not lead to facts making it likely that items officer sought were located in apartment); *United States v. Stout*, 641 F.Supp. 1074, 1078–79 (N.D.Cal.1986)(arrest with cocaine does not provide probable cause to search residence). As one Pennsylvania state court stated, "Probable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home." *Commonwealth v. Kline*, 234 Pa.Super. 12, 16, 335 A.2d 361, 364 (Pa.Super.1975)(invalidating search warrant where affidavit linked defendant to LSD but failed to establish that illegal narcotics were likely in the defendant's house).

In *State v. Ennen*, 496 N.W.2d 46 (N.D.1993), information was given to the magistrate that the defendant was a known marijuana user; his water usage during a three-month period, the summer, which coincided with the growing cycle of marijuana, was unusually high; his electrical consumption records were slightly higher than normal; and the shades in the

defendant's house were drawn. In the opinion of a special agent, this information indicated that illegal drug activity, specifically, considering the high water usage, a marijuana growing operation, was being conducted in the house. The Supreme Court of North Dakota held that this information did not establish a substantial basis to believe that evidence connected with criminal activity would be found in the defendant's house. It explained that the defendant's reputation was a "bare conclusion," which was "devoid of evidentiary support;" the increased water usage during the summer months was consistent with most homeowners's increased usage when growing vegetables; and there was no significant inference to be drawn from the defendant's shades being drawn. *Id.* at 50; *see also State v. Lewis*, 527 N.W.2d 658, 662 (N. Dak. 1995)("The indoor growing equipment could be considered contraband only to the extent it was being used to grow marijuana. The nexus between the [defendant's] home and the probability of marijuana being found there was not supplied by direct or circumstantial evidence"); *State v. Mische*, 448 N.W.2d 415 (N. Dak.1989)("substantial evidence of criminal activity by a defendant at a place other than his home is [not] sufficient probable cause to issue a warrant to search the home of the defendant").

In *State v. Probst*, 247 Kan. 196, 795 P.2d 393 (Kan.1990), the Supreme Court of Kansas held lacking in probable cause to search the defendant's home an affidavit stating that the defendant had been convicted for possessing methamphetamine in her residence fifteen month earlier, that, at that time, she was the girlfriend and employee of an alleged drug dealer, that during the controlled buy, the drug dealer removed methamphetamine from his vehicle that was parked in front of the defendant's residence, and that the confidential informant told the police that the defendant was involved in the sale and distribution of methamphetamine.

In *State v. Anderson*, 37 Wash.App. 157, 678 P.2d 1310 (Wash.App.1984), the court held that an affidavit "did not make an adequate showing that went beyond suspicion and mere personal belief that evidence of the burglary would be

found in the searched residence." 37 Wash.App. at 161, 678 P.2d at 1312. The facts connecting the residence to the burglary were (1) the residents of the place to be searched were customers of the burglarized store, who smoked cigarettes of the type stolen in the burglary; and (2) the police observed stolen items near the residence.

Some cases upholding the validity of search warrants are instructive, as they illustrate the nexus that must exist to link the criminal activity to the place to be searched. *See State v. Amerman,* 84 Md.App. 461, 483–89, 581 A.2d 19, 29–33 (1990)(probable cause existed to search defendant's residence and vehicle where informant frequently purchased marijuana from the defendant by calling defendant's residence, and the defendant's criminal record revealed his involvement, and that of the car sought to be searched in drug offenses); *United States v. Williams,* 974 F.2d 480, 481–82 (4th Cir.1992)(totality of facts established fair probability that drug paraphernalia would be found in the defendant's motel room where three weeks before the search of the motel room, the police found drug paraphernalia in defendant's residence); *United States v. Hargus,* 128 F.3d 1358, 1362 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998), (nexus to search defendant's home existed as investigator's affidavit indicated that the defendant was reached at home when criminal activity was arranged). *See also Jones v. Crouse,* 447 F.2d 1395, 1397 (10th Cir.1971)(affidavit recited that during the robbery of a store, money in wrappers was taken, two victims were shot, and the defendant was seen with a large stack of money in his possession and professed that he had shot two "M——F——'s" in the head), *cert. denied,* 405 U.S. 1018, 92 S.Ct. 1298, 31 L.Ed.2d 480 (1972); *United States v. Dresser,* 542 F.2d 737 (8th Cir.1976)(affidavit recited that victim of armed robbery and attempted murder identified defendant as her assailant, that a .22 caliber bullet was removed from victim, and that police observed gunpowder residue on defendant's hands and also observed a .22 handgun); *Thomas v. Wainwright,* 767 F.2d 738, 740 (11th Cir.1985)(affidavit contained recitations from law enforcement

officers and a paid informant that they had purchased handguns from defendant and a neighbor), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986); *United States v. Hawkins,* 788 F.2d 200, 204 (4th Cir.)(surveillance connected drug activity to defendant's residence), *cert. denied,* 479 U.S. 850, 107 S.Ct. 176, 93 L.Ed.2d 112 (1986); *United States v. Corral,* 970 F.2d 719, 728 (10th Cir.1992)(defendant's return to residence after negotiating purchase price but before actual exchange provided reasonable probability that cocaine was stored in residence).

Hence, based on the forgoing, I agree with the opinion of the Court of Special Appeals:

"There was insufficient information to connect the evidence sought, firearms and ammunition, to the place searched, appellant's car. There was no information that appellant kept handguns or ammunition in his car, nor was there any information that the car was involved in any way with the shooting death of the victim. In analogous cases involving residential searches, a review of Maryland case law reveals that generally something more than was shown here is required to justify a search. *See State v. Edwards,* 266 Md. 515 [295 A.2d 465] (1972)(probable cause shown where informant had conversation with accused in apartment concerning the purchase of drugs, informant also observed drug paraphernalia in the apartment, and accused stated that "he had just got some good stuff in"); *Henson v. State,* 236 Md. 518 [204 A.2d 516] (1964)(where police observed several known addicts entering and leaving accused residence and accused, a known addict, observed receiving money in return for small object justified a finding of probable cause); *Thompson v. State,* 62 Md.App. 190, 488 A.2d 995, *cert. denied,* 303 Md. 471, 494 A.2d 939 (1985)(probable cause for motel room existed where officer had observed narcotics and narcotics paraphernalia in motel room). *See also United States v. Wylie,* 705 F.2d 1388 (4th Cir.1983)(probable cause established where officers were tipped that defendant was inside apartment which was rented by a woman and personal knowledge of officers regarding defendant's past

practice of storing heroin at locations procured by his girlfriends). *Compare United States v. Flanagan,* 423 F.2d 745 (5th Cir.1970)(knowledge of defendant's possession of stolen goods does not, without more, make reasonable a search of defendant's residence).

"We agree with the appellant that the search warrant was invalid because the affidavit lacked information of nexus between the items sought and the place to be searched." *See also State v. Longstreet,* 619 S.W.2d 97, 99 (Tenn. 1981)("The affidavit in this case is devoid of any facts indicating a nexus between the weapon and the . . . automobile. Nothing appears to establish probable cause to believe that the gun was in the [car]."), *overruled on other grounds, State v. Leveye,* 796 S.W.2d 948, 950 (Tenn.1990); *United States v. Madyun,* 986 F.2d 1416 (4th Cir.)(affidavit recited that victim's sister reported that the defendant had threatened her life, that a dark green jeep was seen leaving the scene of the murder, that the defendant owned a dark green jeep, that the defendant's vehicle had been seen by a police officer near the murder scene prior to the murder, and that the defendant had a criminal record evidencing convictions for crimes of violence), *cert. denied,* 509 U.S. 913, 113 S.Ct. 3018, 125 L.Ed.2d 707 (1993).

### (iv)

Admittedly, "doubtful or marginal cases should be largely determined by the preference to be accorded to warrants," *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965), as it encourages law enforcement officials to obtain search warrants before entering private home. This preference for warrants, however, should not result in courts serving as a mere rubber stamp for all governmental searches and, thus, creating a "standardless" test for the issuance and review of search warrants. Protection against unreasonable searches is, and has always been, at the core of the Fourth Amendment. *See United States v. Verdugo-Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990); *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct.

1371, 1379, 63 L.Ed.2d 639 (1980); *United States v. Martinez–Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972); *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961); *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948); *Boyd v. United States,* 116 U.S. 616, 630 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

ELDRIDGE and WILNER, JJ., join in the views expressed in this dissenting opinion.